(78 Misc. Rep. 592.)

## In re VAN NESS' WILL.

(Surrogate's Court, New York County. December 14, 1912.)

1. WILLS (§ 288*)—PROBATE—CONTEST.

   Where a beneficiary under a will does not contest it, and is willing to take under it, she will be presumed to assent to its probate, if the mere execution is established by the proponent.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 651, 652, 662, 664; Dec. Dig. § 288.*]

2. WILLS (§§ 153, 155*)—PROBATE—FRAUD AND UNDUE INFLUENCE.

   Fraud and undue influence, sufficient to avoid a will, are distinct vices, though proof of the fraud may be made under general allegations thereof.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 371, 375–381; Dec. Dig. §§ 153, 155.*]

3. WILLS (§ 164*)—PROBATE—EVIDENCE.

   In probate causes, where undue influence and actual fraud are set up against a will, no fact tending to prove such fraud is irrelevant, if it bears at all on that issue, and the inquiry should be given a wide range.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 403–414; Dec. Dig. § 164.*]

4. WILLS (§§ 164, 166*)—PROBATE—UNDUE INFLUENCE.

   Undue influence, which will avoid a will, may be established either by direct or circumstantial evidence, which is sometimes termed "presumptive evidence"; but, to be admissible, circumstantial evidence must be inconsistent with any other result than the undue influence charged.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 403–414, 421–437; Dec. Dig. §§ 164, 166.*]

5. WILLS (§ 155*)—PROBATE—"UNDUE INFLUENCE"—"COERCION."

   "Undue influence" is unlawful "coercion," which is an artificial state, whereby the testator is deprived of his free will by fraud or any other unlawful means.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*

   For other definitions, see Words and Phrases, vol. 2, pp. 1241, 1242; vol. 8, pp. 7166–7172.]

6. WILLS (§ 2*)—PROBATE—SOURCES OF DECISION.

   The modern law of wills being founded on the civil and canon law, such law, in the absence of modern law, is authoritative in probate courts.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. § 2; Dec. Dig. § 2.*]

7. WILLS (§ 166*)—PROBATE—UNDUE INFLUENCE—LUNACY.

   In a proceeding for the probate of a will, where undue influence and fraud were alleged, it is not necessary to prove that the testator was at the time of making the will insane, to warrant denial of probate.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

8. WILLS (§ 163*)—PROBATE—BURDEN OF PROOF.

   While, in proceedings for the probate of a will, proof by the proponent of a formal compliance with the statute places the burden of proof of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

undue influence upon the contestants, the ultimate burden of proving there was no undue influence rests upon the proponent.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402.; Dec. Dig. § 163.*]

9. WILLS (§ 163*)—PROBATE—UNDUE INFLUENCE—EVIDENCE.

Undue influence, while susceptible of proof by circumstantial evidence, cannot be presumed.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402; Dec. Dig. § 163.*]

10. WILLS (§ 164*)—PROBATE—EVIDENCE.

Where the validity of a will executed by an aged testator in favor of his young wife only a few months after marriage was attacked for undue influence and fraud, and it was urged that the will was the consummation of a conspiracy between the wife and others, evidence of the acts leading up to the marriage, together with the conduct of the parties thereafter, is admissible, where they are all connected with the execution of the subsequent will, although the mere disparity in the ages of the two spouses alone would raise no presumption of an unlawful purpose on the part of the younger spouse.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 403–414; Dec. Dig. § 164.*]

11. WILLS (§ 163*)—VALIDITY—SENILITY.

While there is no presumption of testamentary incapacity by reason of the advanced age of a testator, yet, when his senile state is established, a will giving all of his property to his wife casts the burden upon her of showing that it was his free and independent act.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402; Dec. Dig. § 163.*]

12. WILLS (§ 164*)—VALIDITY—UNDUE INFLUENCE—EVIDENCE.

A sudden change of testamentary intention without adequate explanation is to be considered in determining whether a will is the product of undue influence; and evidence that a testator made slight, if any, provision for his only daughter, giving all of his estate to his third wife, who was much younger than himself, is material on the question of undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 403–414; Dec. Dig. § 164.*]

13. DEPOSITIONS (§ 95*)—USE OF DEPOSITIONS—ADMISSIONS.

Where the deposition of the proponent of a will is taken before trial, the contestants may read any portion of it they desire, and omit the remainder; the basis of the ruling being on the ground of admissibility.

[Ed. Note.—For other cases, see Depositions, Cent. Dig. §§ 276, 277; Dec. Dig. § 95.*]

14. WITNESSES (§ 265*)—COMPETENCY—EFFECT OF TAKING DEPOSITION.

That the proponent of a will, who was the sole beneficiary thereunder, was examined by deposition before trial, and parts of her deposition were read in evidence by the contestants, did not render her incompetent as a witness in her own behalf.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 906; Dec. Dig. § 265.*]

15. EVIDENCE (§ 121*)—RES GESTÆ.

In an action for the probate of a will, contested on the ground of fraud and undue influence, letters received by the sole beneficiary, the testator's young wife, who married him only a few months before the execution of the will, showing that it was her intention to marry him for his money, are admissible as part of the res gestæ, being found in her possession.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 303, 307–338, 1117, 1119; Dec. Dig. § 121.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

16. WILLS (§ 164*)—PROBATE—EVIDENCE—ADMISSIBILITY.

In a proceeding for the probate of a will, contested on the ground of fraud and undue influence, evidence of a decree which fixed the rights of the testator in the property disposed of is admissible; it appearing that the sole beneficiary, who was the testator's young wife, was familiar with the decree under which he received a large sum of money.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 403–414; Dec. Dig. § 164.*]

17. WILLS (§ 164*)—PROBATE—EVIDENCE.

In a proceeding for the probate of a will, contested on the ground of undue influence, conspiracy, and fraud, the question whether the attorney who drew it was familiar with the claims of third persons upon the testator, which were shown by a judgment, is material, where it was claimed that the attorney was a party to the fraud and conspiracy.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 403–414; Dec. Dig. § 164.*]

18. APPEAL AND ERROR (§ 1050*)—REVIEW—HARMLESS ERROR—EVIDENCE.

In a proceeding for the probate of a will, contested on the ground of fraud and undue influence, where it appeared that the attorney who drew the instrument was the attorney of record in an action against the testator, wherein it was shown that other persons than the sole beneficiary had claims upon the testator, the allowance of questions as to whether he was familiar with these facts was harmless, as such knowledge would be imputed to him.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4153–4160, 4166; Dec. Dig. § 1050.*]

19. WILLS (§ 166*)—PROBATE—UNDUE INFLUENCE.

In an action for the probate of a will, contested on the ground of undue influence, evidence *held* insufficient to warrant probate, showing that it was not the will of testator.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

20. WILLS (§ 166*)—PROBATE—BURDEN OF PROOF.

Where the will of a very aged man was drafted by a lawyer resting under obligations to the family as well as the sole beneficiary, who was the testator's young wife, it appearing that such attorney had come into possession of securities of the testator of great value and was paying the income thereof during the life of the testator to the brother of the sole beneficiary, who was in no way entitled to such income, that fact excites suspicion, and proof, other than the testimony of such attorney, that the will was the voluntary act of the testator, must be offered by the proponent.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

21. WILLS (§ 166*)—EXECUTION—EVIDENCE—ATTESTING WITNESSES.

The purpose of the law in requiring attesting witnesses to a will is primarily for the security of the testator and to protect him against force or fraud or undue influence; and hence, where the attesting witnesses are not disinterested parties, their testimony is of little weight.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

22. WILLS (§ 72*)—VALIDITY—ANIMUS TESTANDI.

A paper is not valid as a will, where it was executed, not with the intention of passing any property, but merely as a sort of release to support prior executed assignments in favor of the sole beneficiary.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 189; Dec. Dig. § 72.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

23. WILLS (§ 166*)—PROBATE—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY.

In an action for the probate of a will, which was attacked on the ground of fraud and undue influence, the testimony of a subscribing witness *held* insufficient to establish the validity of the instrument, by showing absence of fraud and undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

24. WILLS (§ 164*)—PROBATE—UNDUE INFLUENCE—EVIDENCE.

Evidence that the sole beneficiary under a will, who was the aged testator's young wife, procured the execution of a writing, attested by the draftsman of the will and purporting to have been signed by the testator, which cast doubts on the legitimacy of the testator's only daughter and threatened her with exposure in case the validity of the will or assignments of property to the proponent was attacked, is admissible as an implied admission showing that the will was not the voluntary act of the testator; it appearing that the recitals in the writing were wholly false and without foundation.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 403–414; Dec. Dig. § 164.*]

25. WILLS (§ 160*)—VALIDITY—RATIFICATION.

Where a will in favor of his young wife was procured by her undue influence, the fact that the aged testator, who had previously assigned to her practically all of his property, and who, beyond receiving the income from a trust estate, which he turned over to her, carried on no business, stated in her presence that the will was his free and voluntary act, does not amount to ratification.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 372, 373; Dec. Dig. § 160.*]

26. WILLS (§ 165*)—VALIDITY—UNDUE INFLUENCE.

When acts of undue influence are proved, declarations of the testator are competent to show the effect of such acts on his mind, and dispel or rebut any claim of imposition.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 415–420; Dec. Dig. § 165.*]

27. WILLS (§ 166*)—PROBATE—ADMISSION.

Under Code Civ. Proc. § 2622, the surrogate must be satisfied of the genuineness of a will and the validity of execution before it is entitled to probate.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

In the matter of the probate of papers propounded as the last will and testament, and a codicil thereto, of Cornelius H. Van Ness, deceased, offered by Alice Wood Van Ness, in which Alice Van Ness Parsons and others appeared as contestants. Probate refused.

William B. Aitken, of New York City (Rastus S. Ransom, of New York City, of counsel), for petitioner.

Agar, Ely & Fulton, of New York City (Charles Blandy, of New York City, of counsel, and Charles Blandy, Jr., on the brief), for Alice Van Ness Parsons.

Conrad Milliken, of New York City, for Emma Louise Van Ness Day.

Martin, Fraser & Speir, of New York City (Wallace Macfarlane, of New York City, of counsel), for Harriet B. Morse and Marie B.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

H. Pierce et al., and for Francis B. Chedsey, surviving executor and trustee of the will of Emma Louise Van Ness.

George Y. Webster, of Rochester, for Mary Campbell.

Parker V. Lawrence, of New York City, special guardian, for Jerome Campbell and George H. Campbell.

FOWLER, S. This has been one of the longest contested probates ever before this court. The contest has been so close, the various points of law have been so ably argued by counsel, and the testimonial evidence is of such great volume as to require a somewhat detailed opinion from the surrogate.

[1] Cornelius H. Van Ness, the alleged testator, when a very old man, made the papers propounded in favor of his third wife, now here as proponent. Much, if not all, of the estate, which in some event purports to pass under the testamentary scripts in question, was derived by Mr. Van Ness under the will of his second wife. Probate of the several papers propounded as the last will of Mr. Van Ness is contested by certain beneficiaries or representatives under the will of the second Mrs. Van Ness, and also by the only daughter of testator's first marriage, now Mrs. Parsons. The daughter, Mrs. Parsons, however, confines her contest to the paper purporting to be a codicil, and she fails actively to contest the will itself, but in an extremely cautious way, as she states at the bar of the court, that she regards it "as unjust." This statement of opinion goes for nothing, as if she does not contest the will, and is willing to take under it, she must be taken to assent to its probate if the mere factum is established by proponent. The special guardian, likewise, contests the codicil only.

The fact is apparent to the surrogate that this disputed will in reality relates to a small part, if any, of the estate enjoyed by the late Mr. Van Ness in his lifetime. Before he made the testamentary writings, now brought into this court for probate, he had made various assignments of his property to his third wife, which are now the subject of controversy elsewhere. The testamentary papers propounded seem to operate, to a great extent, as a sort of further assurance to the third wife. If the assignments to her fail, she falls back on the will. If the will fail, she resorts to the assignments. Thus this probate cause is only an incident in an extensive litigation, or litigations, which ransack the whole estate enjoyed by the late Mr. Van Ness in his lifetime. The proceedings in this court are a mere adjunct to more searching proceedings conducted elsewhere. A contested probate of this character is extremely troublesome in this court, as it magnifies the proofs and involves more than the extent of the property apparently passing under the alleged will justifies.

But such a contest has, perhaps, another relation. When assignments of all a man's estate are in fact made in his lifetime, his will, if it purports to convey the same estate, must operate, in respect of that estate, passing under the assignments, as a mere further assurance. In any other aspect the will reflects somewhat on the validity of the earlier transfers, but possibly to no greater extent than the earlier transfers reflect on the validity of such a will, which also

incidentally violates the trite maxim "nemo dat qui non habet." The assignments being valid, there is no necessity for a will in such a case. But here, I am informed that there is some small estate, outside of the property passing under the assignments, which is operated on by the will, if valid. If this is so, the smallness of the estate conveyed by this will offers a poor justification for the magnitude of this contest in this court. But I will not, on that account, shrink from the fullest consideration of this cause, which is most involved, by reason of the inconsistent positions of the different contestants; one charging actual overt conspiracy, and the others only that conspiracy which is always involved in a charge of undue influence exerted by more than one person.

Cornelius H. Van Ness was born in this state February 14, 1819. In 1845 he married in this state the daughter of his employer. The lady's name was Deborah Bradt. She is still alive, in the ninetieth year of her age. By this marriage Mr. Van Ness had one child, now Mrs. Parsons, one of the contestants of the codicil here offered for probate. During this first marriage Mr. Van Ness is shown to have had a somewhat varied business career, at first being employed in the Erie Canal freight office, and afterwards with various transportation offices. He appears not to have shown extraordinary talent or power of accumulation. His own estate, if anything, was always small. On August 21, 1867, Mr. Van Ness was divorced by a decree of a competent court of this state from the wife of his youth, Deborah, for his own grave delinquency. The decree establishes that his own property was then very small.

In 1875 Mr. Van Ness married Mrs. Emma Louise Burr Wright. There was some offer or attempt to prove that Mr. Van Ness courted this lady while she was the wife of another; but the surrogate excluded this as too remote and not relevant or fair to the dead woman in question. This lady's relatives and representatives are now here contesting on various grounds the probate in this cause. It seems Emma Louise Van Ness was the heiress to a very large paternal estate, of which she shortly after her marriage to Mr. Van Ness, became seised and possessed in her own right. For 23 years Mr. Van Ness lived apparently happily with this second wife, Emma Louise, lastly, on an estate purchased by her at Cornwall, in the county of Orange and state of New York. In 1898 the second Mrs. Van Ness died, and her property passed by her will to Mr. Van Ness, under conditions and circumstances which will, of necessity, be the subject of consideration in this cause.

In the eighty-second year of his age Mr. Van Ness, then being possessed of an apparently large property, contracted his third marriage. This time he intermarried with a very young woman, by name Alice Wood. This third marriage took place under circumstances and conditions shown in great detail in the testimonial evidence offered on the part of the contestants. The third marriage ceremony was twice performed, once in New York City on February 21, 1900, and again in New Jersey on May 11, 1900. It is the widow of this third marriage who now stands here as the proponent of the papers purporting to

.be the last will and codicil thereto of Cornelius H. Van Ness. The will offered for probate bears date June 24, 1901, and the codicil Jan-uary 24, 1902, and both writings purport to have been executed on .their respective dates.

[2] The opposition of the contestants to the probate sought rests .mainly upon charges of fraud and undue influence exercised over the testamentary mind of Mr. Van Ness by the proponent and others un-.known. Absolute incapacity to make any will upon the part of Mr. Van Ness is not precisely claimed by contestants. In fact, such a contention is openly disavowed, both in the record and in the briefs of counsel, as well as at the bar of this court. Undue influence of the proponent over a senile and weakened mind is claimed, inter alia. It is true that fraud generally is also charged to have been practiced by proponent and others unknown on the said Cornelius H. Van Ness in respect of the papers propounded. But the charge of fraud, other than that involved in a charge of undue influence, is not spe-cifically alleged by contestants in their formal objections to the pro-bate. This is unfortunate, for fraud and undue influence are in turn distinct and not distinct offenses. Under the new rules of the English Court of Probate, since 1875, fraud, other than that involved in undue influence, is the subject of a special plea, and if undue influence alone is charged the question of coercion only is raised. Parfitt v. Lawless, .2 P. & D. 462, 470, 471.

In this cause before me both fraud and undue influence are charged separately. The fraud is, however, charged generally and not spe-cifically. It may be only a concomitant of the undue influence charged. It may be that it is some independent fraud. As the pleadings stand, if any other fraud, besides undue influence, is discoverable in the proofs, the contestants are entitled to the benefit of such evidence under the general allegations and somewhat looser practice that still prevail in this jurisdiction. Such practice has long prevailed in this court. That it is possible, even under the present practice, to cause pleas of undue influence to be separated from pleas of fraud in pro-bate causes, and to require allegations of fraud to be more specific than they are in this cause, the surrogate entertains little doubt. One object of written pleadings is to give notice to the adversary concern-ing what he must meet. I certainly should feel inclined, in the interest of justice and precision, to encourage an attempt to make pleadings here more precise. In this cause I have been embarrassed by not knowing to what issue the proofs offered might be intended to apply.

[3] In probate causes, alleging undue influence alone, the proofs naturally take a wide range (Matter of Woodward, 167 N. Y. 28, 31, 60 N. E. 233) and where actual fraud is charged in addition, no fact tending to prove such fraud is irrelevant if it bears at all on the issue of fraud (Matter of Gannon, 73 Misc. Rep. 327, 132 N. Y. Supp. 712). Thus it is that in this cause the proofs extend over a long period of time and are extremely various.

[4] Undue influence, like other offenses against the law, may be proved directly by sworn witnesses of it, or indirectly by established circumstances which permit no other inference than the undue influ-ence charged. Circumstantial evidence is sometimes termed "pre-

sumptive evidence." Like presumptive evidence, it is open to many infirmities. If the circumstances or evidentiary facts sought to be proved on an issue of undue influence are consistent with any other result than the undue influence charged, they are not evidential, and they should be excluded, at least from the final consideration. Evidentiary facts of a circumstantial nature are, however, so subtle, being either moral indications or indications only generally inculpatory, that it is often impossible for the trial judge to determine until the close of the case precisely what bearing the proofs offered really have, and whether or not they are of legal consequence. It is for this reason that in a case of this character the real excluding function of the judge has to be reserved for the judgment, when the circumstances relied on are to be finally weighed and valued. In a case before a judge without a jury, this course is practicable and does not detract from precision. The surrogate has been at some pains to indicate the legal evaluations of circumstantial proofs, because it is by the tests indicated that the complicated and extended evidence adduced in this cause must be weighed.

[5] Undue influence has been so often defined by courts of authority that it is superfluous for us again to enter at large upon such a refined and settled discussion. But in respect of the principle which ought to control this adjudication it may be announced, in brief, that undue influence in law always imports coercion in and about the will itself. In re Campbell's Will, 136 N. Y. Supp. 1104, 1105. Without such moral or actual coercion there is no undue influence in law. Wingrove v. Wingrove, 11 P. D. 82; Williams v. Gaude, 1 Hagg. 581. And see Lord Campbell in Boyce v. Rossborough, 6 Ho. L. Cas. 48. There is a lawful or legitimate exercise of influence, and an unlawful exercise of influence, and the latter is "undue influence." Gardiner v. Gardiner, 34 N. Y. 162. A recognized or lawful influence may be exercised by the most abandoned person, such as a harlot or a gamester, into whose hands a testator may have fallen. It is not the character of the person exercising the influence which is a controlling circumstance in cases of this kind, but the nature and the manner of the influence itself. As well said in Wingrove v. Wingrove, there is no subject in which "there is a greater misapprehension" than undue influence in law. These discriminating utterances of foreign common-law judges are constantly recognized and emphasized in our own jurisdiction. Gardiner v. Gardiner, 34 N. Y. 163; Brick v. Brick, 66 N. Y. 149; Seguine v. Seguine, *42 N. Y. 669; Matter of Will of Martin, 98 N. Y. 196; Smith v. Keller, 205 N. Y. 44, 98 N. E. 214.

But the definition of undue influence just noticed is obviously incomplete. What in law is coercion, or, as it is sometimes designated, "moral coercion"? To define coercion is really the crux of the accepted definition of undue influence. It has been said that it is impossible to define or prescribe undue influence with precision, and that it depends on the facts of each case. Rollwagen v. Rollwagen, 63 N. Y. 519. This can only mean that the law in this regard proceeds by negation; it defines what is not undue influence, not what is undue influence. Some day surely the negative category will be complete,

and an accurate legal definition made possible. Fortunately meanwhile we are not left with so unsatisfactory a working rule. The coercion of the definition may be defined with tolerable precision.

Coercion is an artificial state whereby a testator is deprived of his free will. This deprivation may result from fear, constraint, force, or fraud, or any other unlawful inducing cause, produced by some one, not the testator himself, for the purpose and with the intention of procuring from testator a last will and testament of testator which shall not in fact be the true expression of testator's own testamentary mind or intention. In such instances testator is deprived of animus testandi, which the law requires for a valid act of testamentation. A will so coerced does not speak the testator's own mind or intention in law, and is consequently void. A testator subject to undue influence has not, in other words, in law, "testamenti factio," or testamentary capacity. The law still prevailing here on this point is of very ancient origin, and it remains much what it always has been, and ever will be. 1 Redfield on Wills, 513; Swinburne on Wills, pt. 7, § 2; Kindleside v. Harrison, 2 Phill. 551, 552; 2 Troplong, Des. Testaments, 63; C. I. 2, 1; C. 6, 34, 1.

It is obvious that "coercion," as used in the sense indicated or in the definition of undue influence, need not be induced by actual or physical force. It may be the result of any wrongful means which produces moral restraint and consequent want of free will. Such means in law constitute the moral coercion of the definition. In the year 1564, in Hacker v. Newborn, Style, 427, Chief Justice Roll said:

"If a man make his will in sickness by the overimportuning of another to the end that he may be quiet, this shall be said to be a will made by constraint and shall not be a good will."

This case is cited with approval by the chancellor in Clark v. Fisher, 1 Paige, 177, 19 Am. Dec. 402. But the importunity Chief Justice Roll speaks of must be irresistible and such as to render the act no longer the act of the deceased. Kindleside v. Harrison, 2 Phill. 551; 1 Ecc. Rep. 336; Constable v. Tufnell, 4 Hagg. 485; C., 6, 34, 1.

[6] I have cited the Roman law as still of some indirect influence on probate law and the law of wills, and in so doing I am justified by precedent. In this court the authorized citations of rules of law differ from those employed in the other courts of this state. The testamentary law, administered in this court, stands on its own independent foundations, and it has a long history, too little understood. The genesis of the English and American will was peculiarly Roman, and in every country where wills exist Roman law affecting them remains potentially, even if not expressly, adopted. Kelke, Roman Law, 101. It has been said with accuracy that the entire conception of a will in English law was derived from Roman law, and to understand the history of the English law of wills it is necessary constantly to refer to the great system of jurisprudence from which English law derived that conception. Strahan, Law of Wills, p. 4.

The testamentary law of England became in time, however, only indirectly Roman or civil law, and to understand the law administered in this court in probate causes an acquaintance with the history of

English ecclesiastical courts and procedure is also essential. Markby, Elements of Law, §§ 560–583; Jenk's Hist. Eng. Law, 195. It must be remembered that the English ecclesiastical courts were courts of the civilians, and through them we derive much of our present law of wills. It was for the reasons indicated that civil law is counted one of the recognized constituents of the law of England. Coke Litt. 11b. The influence of Roman or civil law, as also the canon. law in parts, is necessarily to be recognized in probate jurisdictions. Geldart's Elements of English Law, 64. When the Constitution of this state adopted the former law in force in New York, the civil and canon law, then recognized in the ecclesiastical courts of England and the Prerogative Courts of New York, became a part of the fundamental law of this state, and so it continues in this court, in the absence of more direct authority to the contrary, to prescribe the ratio decidendi for probate cases not otherwise provided for by statute or domestic adjudications of authority. Goodrich v. Pendleton, 4 Johns. Ch. 558; Foster v. Wilber, 1 Paige, 540; Public Administrator v. Watts, 1 Paige, 347, 356; Brinckerhoof v. Remsen, 8 Paige, 488; Betts v. Jackson, 6 Wend. 173, 183; Bogardus v. Clarke, 1 Edw. Ch. 266; Introduction to 1 Bradf. Sur.; Vanderheyden v. Reid, Hopk. Ch. 408, 411; Id., 5 Cow. 720, 728; Hunt v. Johnson, 19 N. Y. 294; Robins v. Coryell, 27 Barb. 556; Kirkland's Treatise on N. Y. Surrogates' Courts (A. D. 1830) c. 1.

Few of the principles administered in this court, on the probate side, are either new or original, and to understand thoroughly those in force it is often highly essential to resort to the fons or origo of the entire system. Of course, by incorporation in modern decisions the old canon may be superseded as the most direct authority; but the old canon is never unauthentic or destitute of all weight or force. There is still no reason why in this court the original law should not be cited at all times to illustrate or vivify any derivative principle. It was the original of this court which gave to the common law itself a higher tone and character. The jurisdiction of this court, in origin, is of great antiquity, irrespective of its superadded and now extensive powers as an original court of construction of wills of both real and personal property. The surrogate is induced to make the foregoing observations, not only because they justify his citations, but because they have an exact relation to what he conceives to be a better application of the commonest principles continually applied in this court. Yet he is quite conscious that such incursions into the past require much deliberation at all times, as the origins of law are not to be mistaken for the law itself. The application of law is not to be left to the idiosyncracies of a judge, or to the results of his own researches.

[7] It is not necessary for contestants in this cause to prove Mr. Van Ness insane. It has never been doubted, since Lord Hardwicke said in Lord Donegal's Case, 2 Ves. Sr., 408, that fraud and imposition upon a man of weak mind (which include undue influence) might be sufficient to set aside his will, although his weakness was not sufficient ground for a commission of lunacy. Rollwagen v. Rollwagen, 63 N. Y. 519; In re Campbell's Will, 136 N. Y. Supp. 1104. As

stated before, contestants rest in this cause largely on a charge of undue influence exerted by Alice Wood, the third Mrs. Van Ness, and now the proponent in this cause, as the widow of the deceased. Fraud also is distinctly alleged.

It has been said by the highest court of this state that "undue influence is not often the subject of direct proof. It can be shown by all the facts and circumstances surrounding the testator * * *" Rollwagen v. Rollwagen, 63 N. Y. 519; Children's Aid Society v. Loveridge, 70 N. Y. 395; Matter of Sandberg, 75 Misc. Rep. 38, 44, 134 N. Y. Supp. 869. Certainly, when undue influence is charged and maintained by evidence of circumstances only, the courts are extremely liberal in regard to the circumstances considered evidential on this issue. Delafield v. Parish, 25 N. Y. 95; Rollwagen v. Rollwagen, 63 N. Y. 504, 519; Children's Aid Society v. Loveridge, 70 N. Y. 387, 395; In re Campbell's Will, 136 N. Y. Supp. 1086, 1104.

[8] Having briefly surveyed what is conceived to be the accepted law of this case in order that the evidence may be weighed with more precision, the surrogate takes leave to remark that there are some points which should not be overlooked. After proponent shows a formal compliance with the Statute of Wills, the burden of going forward and making out proof of undue influence lies with contestants. Boyse v. Rossborough, 6 Ho. L. Cas. 51; Matter of Will of Martin, 98 N. Y. 196; Matter of Bolles, 37 Misc. Rep. 567, 75 N. Y. Supp. 1062; Matter of Nelson, 97 App. Div. 217, 89 N. Y. Supp. 865; Matter of Klinzner, 71 Misc. Rep. 638, 130 N. Y. Supp. 1059. But where the ultimate burden of proof on the whole issues raised by the pleadings lies in a probate cause is another matter. Matter of Mooney, 73 Misc. Rep. 323, 132 N. Y. Supp. 705; Matter of Klinzner, 71 Misc. Rep. 638, 130 N. Y. Supp. 1059; In re Campbell's Will, 136 N. Y. Supp. 1102. There can be no doubt that it rests on proponent.

[9] Undue influence, while it may be proved indirectly by circumstantial evidence, cannot be presumed; it must be proved with precision. Boyse v. Rossborough, 6 Ho. L. Cas. 49; Cudney v. Cudney, 68 N. Y. 148; Loder v. Whelpley, 111 N. Y. 250, 18 N. E. 874; Matter of Richardson, 137 App. Div. 103, 122 N. Y. Supp. 83; In re Campbell's Will, 136 N. Y. Supp. 1104. This rule is as old as Ulpian, "Dolum ex indiciis perspicuis probari convenit," and it is a part of the testamentary law of every nation where wills are allowed. Pothier, Pand. tit. 1, p. 125, No. 10; 2 Troplong, Des Testaments, 64.

What do these rules, recognized in all probate courts, mean, except that strained inferences and arbitrary assumptions are not to be indulged in on an issue of this kind? The evidence must be cogent and permit no other inference than undue influence. The danger of all circumstantial evidence is that some pride of intellectual ingenuity or some irrelevant guesses and unauthorized assumptions may be suffered to bridge chasms of missing proofs. Circumstantial proofs must be irrefragable and they must irresistibly point with moral certainty to the factum probandum. If the circumstances relied on in

this cause are consistent with any other hypothesis, they are not proof of undue influence. People v. Razezicz, 206 N. Y. 249, 269, 99 N. E. 557. Although the court can never presume fraud or undue influence, it may require of proponent, in a proper case, very strong proofs of intention in order that probate may be granted. Mortimer on Probate Law, 80; Billinghurst v. Vickers, 1 Phill. 187, 194; 1 Ecc. Rep. 70. This is a very important principle of probate law for our consideration in this particular cause, founded largely on circumstantial evidence of an overreaching of a mischievous kind.

[10] This brings us to the general consideration of the first point of difficulty in this cause. I refer to the circumstances proved in relation to the third marriage of testator, or that to Alice Wood. Much time was consumed on this branch of the trial. The circumstances in and about the marriage of Mr. Van Ness to Alice Wood are greatly relied on by contestants to prove undue influence on her part in and about the subsequent procurement of the papers propounded in this cause. It is claimed by contestants, in substance, that a young stranger enticed an old and amorous man, in his dotage, into matrimony for her own ulterior ends, and that she accomplished these ends by undue influence, circumvention and artifice. From the facts surrounding her marriage, I am asked to infer undue influence in subsequent acts and events. The first question of law for me in my own mind is whether the circumstances in and about her act of marriage ought to be assumed to be connected with subsequent circumstances of a different nature tending to prove undue influence in and about a later will made in the favor of the young woman by her husband. To inquire into the motive which induces any status of marriage is to me abhorrent, and I think, as a general rule, it is contrary to public policy. To my mind all prior acts, conduct, and negotiations of the intending spouses in and about an act of marriage are to be regarded as merged in their subsequent marriage, if it is a marriage de jure, or one recognized as a marriage in fact and in law. If there is not sufficient fraud or incapacity about such circumstances to induce the active interference of a court of equity, either to set aside the marriage or to secure the property of the offended spouse to his or her own uses, no other court ought, in my judgment, to question the motive of the act of marriage itself.

I should be of the opinion ordinarily that an allegation of undue influence in such a case in a probate court must be confined to strict proof of circumstances in and about the will itself, and that, a status of marriage being an accomplished fact, the spouses of an immoral marriage are in the same relation towards each other as any other spouses in so far as the property of either is concerned. It is noticeable that it has been often held that the successors to the ecclesiastical courts, retaining jurisdiction of the marriage relation, have no power to pronounce a decree of nullity because of fraud in the inducement of marriage. There certainly may be frauds in inducements of marriage which end there and have no subsequent relation to a charge of subsequent undue influence of either spouse over the other. But, on the other hand, such frauds in the marriage inducement may under some circumstances be

actually connected with the subsequent undue influence of one of the spouses. Each case depends on its own circumstances.

There is authority, both English and American, to the effect that extraordinary circumstances in and about a prior marriage may be considered on an allegation of undue influence in the subsequent procurement of a will from one spouse in favor of the other. In Clark v. Fisher, 1 Paige, 171, 19 Am. Dec. 402, the marriage was regarded as a circumstance of the unlawful performances consummated by a will. In the well known case on the will of Rollwagen (Rollwagen v. Rollwagen, 83 N. Y. 508) the Court of Appeals went very far I venture to think. They appear to sanction an inference from discrepancy in age, taking into account the ill health of the man and the poverty of the woman, that their marriage was not therefore "a marriage of affection," and that such a woman "could have no motive to marry a helpless and broken-down man except his wealth." From that decision I would, perhaps, be justified in drawing a similar inference here, but I will not. In Hoffman v. Hoffman, 192 Mass. 416, 78 N. E. 492, all the facts in and about the marriage of an elderly man to a younger woman were allowed to be proven on an issue of undue influence in her subsequent procurement of his will in her favor. In the case of Marshall v. Tyrrell, 2 Hagg. 84, 4 Ecc. 33, 42, 43, Sir John Nicholl, a renowned judge in testamentary causes, went very far in inferring improper motives on the part of an elderly husband to get possession, through a will, of his elderly wife's separate property. Sir John even criticises letters from him of apparent affection as inconsistent with the age of the parties, and from that fact alone he infers that the letters of the husband have more the appearance of being written with a view to "wheedling the wife out of her estate." To my mind, Sir John Nicholl went too far in his utterances and conclusions in that cause. He should have drawn no inference of the kind stated, if another was even possible. Yet Marshall v. Tyrrell is a leading case in probate courts.

These are very exalted utterances of authority which I have just instanced, and to some proper extent they are those to which the surrogate may be bound to defer in this cause. But, nevertheless, I venture to think for myself that some of such inferences are not wholly legitimate in application by the stricter principles of the law governing circumstantial evidence. A mere discrepancy, however gross, in the age of the spouses, seems to me to tolerate no conclusion in law that there is an absence of affection between them, or that one will necessarily overreach the other. There are well-known instances of deep affection and good faith between apparently ill-mated spouses, and one such instance destroys the legitimacy of an inference of the kind indicated. An inferior court is always obligated to take the law from the superior courts of its jurisdiction. But it is not bound to adopt mere inferences which are unnecessary to its judgment. I am, in fact, in extreme doubt, having reference to the principles controlling circumstantial evidence, whether many of such inferences as those stated in the cases cited were intended to be prescribed as invariable inferences from certain facts proven. There are some sanctuaries where even the law cannot penetrate, and one, to my mind, is the heart of man or

woman, no matter their ages, in and about their individual act of mar-
riage.

In all events, the facts proven in and about the act of any marriage
should in a case of this character be directly and irresistibly connected
with the subsequent testamentary act. Otherwise no conclusion in re-
spect of the illegality of a subsequent testamentary act is possible to be
drawn from a supposed immorality or indecency on the part of the
younger spouse, connected with the separate act of marriage. On this
point I entertain no doubt, and I shall venture to observe the distinc-
tion denoted in weighing the evidence in this cause. That it is more
natural for the young to mate with the young all sensible persons will
agree, and that there is a certain lack of dignity in elderly marriages
some will readily concede. But the law draws no harsh inferences
from acts entirely lawful, no matter how lacking they may be when
subjected to a test by the highest canons of good taste. If the parties
to the marriage are capable, the marriage is conclusive on the status of
husband and wife. I have so firm a conviction of the great importance
of the law regulating the status of marriage that I will not minimize
it for the purpose of sustaining or rejecting a will of one of the spouses
by mere inferences.

While it is true, I think, that an assumption of an unlawful intent
upon the part of the younger spouse ought not to be made from the
poverty of one spouse and the wealth of the other, or from a mere
discrepancy in the ages of the spouses, there may under the authorities
be other circumstances surrounding a marriage with are fairly entitled
to be taken into consideration on the allegation of subsequent undue
influence exerted by one spouse over the other. The situation of the
parties at the time of marriage, the mental strength of one spouse
and the weakness of the other at the time the status of husband and
wife is first determined, may have some direct relation to a subse-
quent testamentary act on the part of the weaker spouse. A fact or
situation once proved to exist may, in the absence of proof to the
contrary, be presumed to continue. Indeed, there are occasions when
subsequent situations may be shown in no other way. In such cases
to reject such proofs would, I think, be a denial of justice. This is
the true principle, as I conceive, of the decisions cited.

Again, when a conspiracy or fraudulent purpose is alleged in a pro-
bate cause, such as that of an unscrupulous and artful young woman
and her evil associates to gain possession of the estate of an elderly,
desolate, and weak-minded old man through marriage and a will, the
facts connected with her first relations with her husband may be
highly material, and it may then be necessary to risk invading the
marriage sanctuary itself in order to establish the real facts. In this
cause, where no bill of particulars or pleadings, in the true sense, ex-
isted, it soon became apparent to the surrogate that such was the
claim of contestants. Counsel for one or more contestants distinctly
avowed on the trial that there was a conspiracy to gain possession of
the estate through the marriage and the will, and he named the drafts-
man of the will, Mr. Parshall, as one of the participants with the pro-
ponent. The act of marriage, however, seems to have been prior to

Mr. Parshall's active participation; but this is not necessarily fatal to the claim of conspiracy or fraudulent concert. In civil cases the essential element is the resultant wrong, not the concert, and the common purpose and agreement may be inferred from collateral acts, raising a presumption of the common design. Rex v. Murphy, 8 C. & P. 297, 311; Wright on Conspiracy, 54, 58.

[11, 12] In order to understand the proofs of contestants tending to show that at the time of his marriage and the making of his will testator was in his dotage, eccentric, and feeble-minded, and thereby rendered peculiarly susceptible to outward influence of a feminine kind, we must first construct from the evidence the normal man, both mentally and physically. A man asserted from circumstantial incidents to be in such a state of dotage and subjection must be compared with himself in periods of his health and freedom from subjection; otherwise our inference from the circumstances proved may err. Matter of Hock, 74 Misc. Rep. 20, 21, 129 N. Y. Supp. 196. We are all familiar with the common principle that there is no presumption of testamentary incapacity by reason of advanced age alone. But when a senile state is established the proponent's proofs must be clear.

In his best days it is obvious that Mr. Van Ness was not what is called a cultivated man, nor was he a moral man with women. There is no evidence that intellectually he was a strong man. The nature of his early education and his subsequent employments precluded much intellectual development beyond that necessary at first to a gainful existence. He had native intelligence, and little more. In 1845, in his twenty-seventh year, he contracted his first marriage. In 1867 he was divorced by his first wife for the gravest delinquencies on his part, and in 1875 he was married to Mrs. Wright, from whom, as already stated, he derived the large property now indirectly in controversy in the courts of this state. He and his second wife seem to have lived mainly and for many years in the country, and there is no evidence that while there he ever formed any close friendships with men or exercised any influence among the men of his neighborhood or the county of his adoption. His life was isolated, apparently. His tastes were simple and secluded, as the life he led indicates. His letters reveal a man of somewhat weak sentimentality, one somewhat morbid about death and the trappings of death, such as ostentatious and costly tombs. That he was all his life devoted to women and preferred their society is apparent from the whole evidence in the cause. I refer to this point with reluctance, and only because it bears on the evidence given to prove contestants' claims of his dotage and a particular feminine subjection. The divorce record in evidence discloses his relations with women in the prime of his life. It is a proceeding in rem, binding on all the world.

At the time of the death of his second wife, Emma Louise, Mr. Van Ness was in his 80th year, and no doubt the shock of her death was great. Her life must have been most closely bound to his in consequence of the peculiar obligations entailed by the intermarriage of persons situated as both then were. There is no reason to conclude that his grief for her death was not genuine and his isolation com-

plete, no matter what peculiar or tasteless form his grief may have exhibited. Whether the forms in question are consistent with the normal man or only consistent with dotage and mental weakness is one of the questions at issue. That the death of his second wife left him a lonely old man, without occupation or intellectual resources, is apparent. In testing his subsequent conduct we ought not to apply to either the life or the conduct of such a man standards of comparison derived from the habits and conduct of more elevated men.

That some of the contestants' evidence of Mr. Van Ness' acts is consistent with the claim of dotage and abnormal eccentricity on the part of Mr. Van Ness is all that can be inferred. Standing alone, such evidence would be insufficient to establish testamentary incapacity. But even if it denotes only the weakness of age, that fact, if established, is not to be disregarded in a probate cause, where fraud and undue influence are charged, and attempted, as in this cause, to be substantiated by circumstantial proofs only.

The testator's family relations must next be considered. From the time of Mr. Van Ness' second marriage with Emma Louise Wright, in 1875, until her death in 1898, Mr. Van Ness' intercourse with his first wife's daughter, Mrs. Parsons, was necessarily interrupted. This daughter lived with her mother, Mr. Van Ness' wife, who had divorced him, and Mrs. Parsons' sense of dignity and propriety toward her mother precluded such intercourse with her offending father. But after the death of the second Mrs. Van Ness, Mrs. Parsons, with apparent delicacy and amiability, became reconciled to her father and he to her. That the daughter was in every way his superior was apparent on the trial. That before his third marriage the father's affection, or such as he had to give, returned to his only daughter, after his second wife's death, is also apparent in detail. He exhibited some real interest in this daughter and presented her with an elaborate and costly tomb, quite out of keeping with her apparent and regular means of existence.

The small settlement in money which Mr. Van Ness also made on his daughter, after his second wife's death, exceeded only by a little the cost of the tomb, but not by much; both items agregating from $50,000 to $60,000. At that time the income of Mr. Van Ness was very large, and his mode of life relatively inexpensive. He could very well afford to do what he did for his daughter without resort to his donative or controlling powers over the principal of the estate then enjoyed by him under the will of Emma Louise Van Ness. That the relation of father and daughter was completely re-established after his second wife's death admits of no doubt. Nor does it admit of any doubt that before testator's subsequent marriage to Alice Wood he exhibited a great interest in Mrs. Parsons' comfort and permanent welfare, and intended to provide for her. This is the only evidence, out of the great mass submitted to the surrogate in this cause, which tends to show any really elevated or entirely normal intention on the part of this singular testator. The change of testator's intentions towards his daughter after his third marriage is not adequately explained. The justification attempted is no justification in fact. A

sudden change of testamentary intention, without adequate or sufficient explanation, is a fact to be considered by the surrogate in a cause of this character. Matter of Mooney, 73 Misc. Rep. 317, 132 N. Y. Supp. 705.

Mr. Van Ness, after his second wife's death, was in the eightieth or eighty-first year of his age. He then lived alone in his country home, with several servants, among them Mr. and Mrs. East, who were brought back from England to testify in this cause, and their evidence is much relied on by the contestants. This man and his equally elderly wife seem to have performed almost all the household duties for Mr. Van Ness, as they had in the lifetime of the second Mrs. Van Ness. Later they were aided by their niece, Lilian, a very young English woman, who soon was high in the favor of their common employer. Mrs. East, the woman servant, testifies that Mr. Van Ness, after the death of the second Mrs. Van Ness and about the time that Miss Alice Wood appeared on the scene, was in such a helpless condition that she even gave him his bath and dressed and undressed him. This testimony is not contradicted directly. No doubt, after the death of the second wife, Mr. Van Ness was both ill and prostrated, and such ministrations ought to be referred, I think, largely to that immediate period.

Certainly this extremely weak condition must have somewhat altered for the better, for there is much competent and uncontradicted testimony showing that Mr. Van Ness was some little time afterwards a vigorous and very active man for his age. He continued to drive his own favorite horses with some skill. The Reverend Father Curry, the priest of the village church, near Mr. Van Ness' country house, testified to the condition of Mr. Van Ness, and stated that, about the time of Alice Wood's arrival at Cornwall, Mr. Van Ness was an active, spare man, appearing not more than 65 years of age. But Father Curry had but a slight acquaintance with Mr. Van Ness. Yet entire confidence is to be placed in the accuracy of this reverend gentleman's observation on this point. He was both competent and most disinterested. But there must have been many other country neighbors of Mr. Van Ness at Cornwall whose observation of his condition was more extended. If so, they were not called to the stand, with one or two solitary exceptions. The service of the East family to Mr. Van Ness terminated in April, 1900, shortly after his third marriage. After that time their evidence throws no light on the controversy. Before then their evidence, if taken as true, is most important.

There is much disagreeable evidence in the record, and some arguments of counsel which I will not refer to, unless they are imperatively necessary to my conclusions. Mr. Van Ness was a very old man at the date of his last marriage, but some inferences suggested from that fact would not be proper for a court of justice. In summing up the testimony and taking account of the arguments of counsel, of course, the court must take the facts and arguments as it finds them, and not as it would prefer them. The case is not an ordinary one, and, if there are some incidents or arguments which seem trifling

or indelicate, the surrogate at least need not dwell on them longer than necessary.

The testimony of the servants, Mr. and Mrs. East, is so important that the weight to be accorded to it requires much consideration. The testimony of dependents in a household concerning household matters is always to be scrutinized with some care in cases of this character, not because there is any diminution of average truthfulness by reason of such an honest status, but for other reasons hereafter mentioned. It is true that there are many grades of domestic servants. We are all familiar with the classical instance of Cicero's servant, M. Tullius Tiro, who was one of the most accomplished men of his time, honored by the Romans, and greatly respected and confided in by Cicero himself, as the latter's letters disclose. So at present, or until lately, in long-established and substantial households of this country, there were generally dependents on whose wise service, honest affection, and fidelity the employer greatly relied.

But as regards the evidence of the best domestic servants, about the affairs of a family, there is always this defect: In most instances they are not permitted to see much of the reality. Most family matters of importance are kept concealed from them. Their range of vision is consequently oblique and inadequate; it is rarely direct and complete. It is for this reason that their evidence in cases like this is always to be scrutinized with some care. The Easts, although apparently not of the highest order of domestic servants, evidently enjoyed the full confidence of their employers, and their testimony, if taken as true, is most important in this cause. Had the proponent, Mrs. Alice Wood Van Ness, contradicted it on her oath, and she was present throughout the trial, I might have given it less weight. But she did nothing of the sort, and so it is that this important and most incriminating testimony stands before me wholly uncontradicted. It bears on its face no such marks of inherent improbability as to compel me to disregard it, in view of the proponent's failure to challenge it by her contradiction.

[13] It is true that, at the instance of contestants the deposition of Mrs. Alice Wood Van Ness was taken before trial and that some portions of the deposition so taken were read in evidence before the surrogate by counsel for contestants, while still other portions were read by counsel for proponent. This deposition was taken before trial under the provisions of the Code of Civil Procedure, and it was read in evidence pursuant to the Code of Civil Procedure. Berdell v. Berdell, 86 N. Y. 519. The party reading it in evidence was at liberty to read any parts of the deposition which he preferred to read and to omit any parts not desired. Smith v. Crocker, 3 App. Div. 471, 38 N. Y. Supp. 268; Parmenter v. Boston, H. T. & W. R. Co., 37 Hun, 354; Whitlatch v. Fidelity & Casualty Co., 21 App. Div. 124, 128, 47 N. Y. Supp. 331.

The party who reads any portion of such deposition makes it a part of that party's own direct evidence; but he is not estopped to object on the trial to his own questions, so put to the witness, as irrelevant or incompetent. Cudlip v. N. Y. Eve. Journal Pub. Co., 180 N. Y.

85, 72 N. E. 925. This is a singular variation from common rules of evidence, but it is one well established. The rules relative to reading parts of the deposition, I think, proceed on the old ground that a party may always use the admissions of the other side, or their answers to interrogatories, without putting in the whole admission or answer, leaving it to the trial judge, or to the other side, to require the whole answer, if explanatory, to be read. Phipson, Ev. 218, 220. Whether either the present or the old rule justifies reading the entire deposition, because some parts of it are used, I have doubt, at least if the balance does not qualify or explain those parts first read. Parmenter v. Boston, H. T. & W. R. Co., 37 Hun, 355. But that point is not now here.

[14] In any event, the fact that Mrs. Alice Wood Van Ness was so examined before trial, and that parts of her deposition so taken before trial were read in evidence by contestants, did not render her incompetent as a witness in her own behalf on the trial before the surrogate; and when it is here stated that she failed to go on the stand and deny certain evidence given on the trial by the Easts and Mr. Chedsey reflecting on her, this statement is to be taken with this qualification now mentioned. The parts of her deposition read on the trial failed to contradict the evidence of the Easts or that of Mr. Chedsey before referred to, as given on the trial. Thus it is that such evidence remains uncontradicted before me, either by the deposition or by any subsequent evidence of Mrs. Alice Wood Van Ness herself. Why the proponent did not take the stand in her own behalf I am not advised.

The testimony of Mrs. East, taken on the trial, concerning Mr. Van Ness' physical prostration after the death of his second wife and at the period of the arrival of Miss Wood on the scene at the country home at Cornwall, is confirmed by her husband, the manservant East; but, as stated before, the period of Mr. Van Ness' greatest prostration ought, I think, to be confined to the period of his acute illness after the death of his second wife. That for some time in the latter part of 1899 Mr. Van Ness was very feeble in health is established. The actual condition of an old man's health and strength is apt to be better known to the inmates of his household, who can more readily detect the signs of his weakness, than it is to the outside world or to casual acquaintance. Although Mr. Van Ness throughout his entire life probably preferred female society, it is not without significance that when the young English woman, Lilian, came into his household after his second wife's death she at once procured some influence over her aged employer, receiving from him very costly and inappropriate presents, without any apparent consideration, and, I think, driving out with her employer.

This is claimed by contestants to be significant of Mr. Van Ness' dotage and speedy subjection to feminine influences. Yet too much stress is not to be placed on these extraordinary incidents, if we consider the habits and nature of the employer himself throughout his long life. That they are not without significance in connection with other established acts of the alleged testator is all that can be inferred,

having strict regard to the probabilities of circumstantial evidence. The surrogate would be unauthorized in the instance of Mr. Van Ness to infer senility or testamentary incompetence from such unbecoming incidents as these alone.

Much testimony of the contestants was directed to other strange incidents and circumstances, relied on by contestants as significant of undue influence, conspiracy, and fraud, as well as senility and weakened condition of the alleged testator in the years 1899, 1900, and 1901, the period embracing his first acquaintance and marriage with Alice Wood and the making of the contested will. The attentions of Mr. Van Ness to various women, including the young country girls whom he met on the roadside or casually elsewhere, are instances in point, and are much relied on by contestants, or I should not notice them. It is, however, apparent to me that this may have been stupid jocularity on his part. At this time Mr. Van Ness certainly contemplated matrimony, and he was rather insistent on procuring a young and pleasing wife. As stated before, while these sudden civilities or attentions to young women are not peculiarly appropriate to his age, they may not have been altogether inconsistent with Mr. Van Ness' normal states and habits. Such incidents were certainly not conclusive proof either of weakness of mind or of testamentary incapacity in his particular case, although they are entitled to be considered.

Nor do I think that the contestants' evidence, going to show his morbid interest in costly tombs, in absurd and tasteless printed panegyrics of the dead, or in memorial effigies, are, in his case, more indicative of mental weakness of mind than they are of his congenital want of correct taste in all matters of propriety. This man in his normal state, it must be remembered, was an exceptional being. It appears that after the death of his second wife Mr. Van Ness erected in the gable of her old house the figure of an angel, which he thought somewhat resembled the departed lady. This fact proves a certain exaggeration on his part, but, perhaps, nothing more in itself. This figure of an angel he ultimately removed, it seems, to the mausoleum which he constructed at great expense in Greenwood, where his second wife's remains were placed. Mr. Van Ness always manifested a lively interest in this mausoleum and other family tombs.

That Mr. Van Ness, the alleged testator, was during the years 1899, 1900, and 1901 a very old man, somewhat eccentric and susceptible to female influences, is, I think, established. That he was an easy prey to designing people is likewise established, although there seems to have been a dominating note and strength of purpose at times apparent in him, which he mainly reserved for trifles. In no instance of importance was it ever apparent. In all trifles he was firm, and in all important matters obviously weak. But had there been no evidence of fraud, circumvention, or undue influence in this cause, his testamentary power would have been sufficient. His actual condition, as established by the proofs, made it highly incumbent on proponent to substantiate the fact that the papers propounded were the acts of a free, unrestrained, conscious, and capable testator. The question is:

Did she so establish the papers propounded as to entitle them to probate under the well-established law governing probate of contested wills?

It appears by the evidence that on November 5, 1899, when the grief of Mr. Van Ness for his late wife was apparently somewhat allayed, as shown by some of the incidents mentioned, the proponent, then Miss Alice Wood, suddenly appeared at his country home in Cornwall. This then very young stranger, more than half a century Mr. Van Ness' junior, was a native or resident from her early youth of Port Jervis, in the same county, and was at that time sojourning temporarily at Cornwall. It is established that she was then in very poor circumstances. As the result of a slight mishap to her ankle in front of Mr. Van Ness' house, Miss Wood entered the house on November 5, 1899, and was cared for by one of Mr. Van Ness' woman servants, Mrs. East. Miss Wood did not meet Mr. Van Ness on that occasion, as it appears. But on the day following she called in person to thank Mr. Van Ness. He invited her in, and on this first occasion she is sworn to have embraced him and to have protested that she could remain all her life in his attractive house, or words to that effect. On that occasion the testator was so affected as to shed tears. Miss Wood then left, but the next day Mr. Van Ness took Miss Wood to drive, and in a day or so it seems he followed her to the city of New York. A few days subsequently Miss Wood came quite unattended for a visit of some duration to Mr. Van Ness. Reciprocal visits followed between Mr. Van Ness and Miss Wood's family; but it is quite unnecessary to go into all the uninviting details of the evidence concerning this courtship, which resulted in a first marriage ceremony in the city of New York on February 21, 1900, a little more than three months after the first meeting of the contracting parties.

The important points in law are the only necessary considerations for the surrogate. In order to be just to the parties concerned, too much weight should not be placed on what may be termed the unconventional character of some of the incidents surrounding the accidental acquaintance or the character of the courtship in question. These incidents concern mainly the parties themselves, and they may not be inconsistent with their ideas of propriety. That they are not without weight in this cause depends on their precise relation to subsequent events of greater importance.

We come next to the consideration of matters which do constitute the gravamen of the contestants' case: The facts proven are claimed to show undue influence, fraud, and circumvention in and about the unlawful procurement by the proponent and her abettors of the estate of Mr. Van Ness, including the will propounded. A will is claimed to be only part of the res of which Mr. Van Ness was defrauded. If the marriage of Mr. Van Ness to Alice Wood was in fact only a part of an avowed and established scheme, it should be so considered. Otherwise the facts attending the marriage itself, however lacking in conventionality, are to be disregarded. The newly married couple, as it appears, went to Mr. Van Ness' house at Cornwall to live immediately after the ceremony on February 21, 1900, which was unattended by his friends or relatives. On his arrival at home the alleged testator

was taken ill from a cold, and he kept his bed for several weeks. During the first month of the newly married life of Mr. and Mrs. Van Ness, the declarations of Mrs. Van Ness are given in evidence as tending to prove her intent and purpose and the fraud and undue influence charged by contestants. Had she seen fit to contradict them, I should have given her contradiction close attention; but she did not.

[15] It is uncontradicted that the proponent, shortly after marriage, told Mrs. East that she had heard before her acquaintance with Mr. Van Ness "that there was a rich old guy up the country that wanted a wife badly, and that was how she came to know Mr. Van Ness." This declaration stands wholly uncontradicted, and the surrogate cannot disregard it, in view of the character of his acquaintance with proponent and Mr. Van Ness' condition at the time. Such declaration is only important in connection with other closely related facts, established on the hearing.

The surrogate must now pass to a circumstance greatly relied on by contestants and strenuously objected to by counsel for the proponent. Within a month after the marriage, as Mrs. East swears, proponent requested Mary East to allow proponent to have some of her correspondence from the "dearest fellow in Brooklyn," by name Pobe, addressed under cover to Mrs. East, and proponent then stated that she had married Mr. Van Ness "for his money." This last declaration is reiterated by the witness, Mr. Chedsey. Proponent, though present in court, never contradicted this extraordinary testimony, and its truth stands confessed or without contradiction. The result of this arrangement with Mrs. East about the correspondence was that a letter purporting to be from one Pobe, but addressed to Mrs. East, was opened by the younger maidservant, Lilian, as her aunt, Mrs. East, could neither read nor write. This letter was part of proponent's own correspondence and was ultimately received in evidence.

Its reception was the subject of much and long discussion by counsel. The counsel for proponent vigorously claimed that the letter was incompetent, and all the counsel for contestants with equal insistence claimed it to be competent evidence under the issues. A copy of the letter, it appears, had been annexed to the proceedings in the Supreme Court, to which I shall have occasion subsequently to refer, and secondary evidence of it as lost was first resorted to in this cause. It appears that some part of the record had in some mysterious way been abstracted from the files of the Supreme Court, and this occasioned embarrassment. But in any event the original letter was finally produced on the trial before the surrogate. It seemed at first to the surrogate that a letter written by a third person not called to the stand, and not proved except by production, ought not to be received in evidence over proponent's objection. But upon further reflection, although on this point I was less assisted by the arguments of the learned counsel than on other points in the cause, the surrogate decided to receive the letter, in view of its surroundings and the issues raised by the pleadings.

When the state of mind of a party, with reference to a transaction at issue, is material, all acts and declarations from which it may be inferred are in general prima facie evidence for or against her. Her

possession of incriminating documents containing the information, especially if answered or acted upon by her in any way, are evidence of the truth of their contents for or against her. They are then part of the res gestæ, or they are equivalent to statements in her presence which may operate as a constructive admission of her own. Rex v. Plummer, Russ. & H. Crown Cas. 264; Fairlie v. Denton, 3 Car. & P. 103, and note pp. 104 and 105; Com. v. Eastman, 1 Cush. (Mass.) 189, 215, 48 Am. Dec. 596; Sturtevant v. Wallack, 141 Mass. 119, 4 N. E. 615; Spies v. People, 122 Ill. 1, 12 N. E. 865, 17 N. E. 898, 3 Am. St. Rep. 320; People v. Smith, 172 N. Y. 232, 233, 64 N. E. 814. Thus it is that letters from men merely found in a woman's desk are sometimes admissible as a part of res gestæ. Walton v. Green, 1 C. & P. 621. So, when the terms upon which two parties lived are material, their letters to third persons are admissible evidence of that fact, although not of the truth of all matters stated. Willis v. Bernard, 8 Bing. 376.

That proponent did carry on a correspondence with Pobe and his roommate was fully established aliunde, and that the Pobe letter came to Mrs. Van Ness and was part of her own correspondence stands uncontradicted. There was, in fact, proof in this case which distinctly connected the proponent with the Pobe letter within the language of the cases cited. So far as the letter itself reflects on the state of mind or intent of proponent to despoil the testator, the contents of the very objectionable letter, to which I shall not otherwise allude, may have some bearing on subsequent events. I do not, however, attach much weight to the Pobe letter in view of proponent's careless action on receiving it, although I cannot reject it altogether. She tossed it aside, as she said, unread, and it fell into the hands of others.

Mr. Chedsey, the very respectable family lawyer, who had long been connected with the estate of the second wife, Emma Louise Van Ness, gave very important testimony about the Pobe letter and proponent's conduct concerning it. Mr. Chedsey's evidence on this point also stands uncontradicted, although it was in proponent's own power to have denied it if untrue. Taking his testimony on this point as true, it establishes, I think, without the necessity of resorting to the Pobe letter, an original design on the part of the proponent to marry an aged man "for his money." Precisely what this expression "to marry for money" may mean is perhaps open to argument, but that it means at least that proponent intended by marriage to advantage or benefit herself is open to no equivocation. We thus start with a declared intention on the part of proponent which may cast some light, however dim it may be, upon the subsequent testamentary acts in proponent's favor. Her statement in itself is sufficient to establish her original intention in connecting herself with the aged testator without resort to the Pobe letter. For this reason I am inclined to disregard the Pobe letter in arriving at my conclusions, and to accord to it no evidential weight whatever in this cause, thus relieving the cause itself from a difficult point of law.

[16] We come next to the nature and situation of the testator's property. The nature and situation of the property of a testator is

always properly before the surrogate on an allegation of undue influence in a testamentary cause. Matter of Woodward, 167 N. Y. 28, 60 N. E. 233. The judgment roll in the action of Harmon v. Van Ness in the Supreme Court of the state of New York was ultimately put in evidence in this proceeding, and the judgment is certainly binding as between the parties thereto and the persons claiming under them in this proceeding. It discloses much concerning the nature and the situation of the testator's property at the time the papers propounded came into existence. It also discloses that shortly after the intermarriage of Mr. Van Ness with Alice Wood the will of Emma Louise Van Ness was construed in that action by the Supreme Court of this state, and that the rights and powers thereunder of Mr. Cornelius H. Van Ness, whose will is now offered for probate in this proceeding, were determined to be plenary.

The persons entitled under the will of Emma Louise Van Ness, in the event that Mr. Van Ness did not exercise the powers of disposition conferred on him by the will of his wife, Emma Louise Van Ness, had brought that action against him individually and as executor of Emma Louise Van Ness, claiming in substance that the said Cornelius H. Van Ness was then 82 years of age and under the dominion and control of Alice Wood, whom he had lately married, and that the estate would be wasted and the powers enjoyed by Mr. Van Ness under his wife's will would be perverted from their intended purpose. Alice Wood Van Ness, the proponent, was a party defendant in that action, appearing by Mr. Parshall as her attorney. The result of the action was a judgment which provides, inter alia, that $375,000 received by Mr. Van Ness under the will of Emma Louise should be set apart by him and paid to trustees, on trusts to receive and pay over the income to Mr. Van Ness for his own life, remainder to those claiming under the will of Emma Louise Van Ness. The segregation of the trust estate under this judgment of the Supreme Court, although this is immaterial, must have proceeded, I think, on some such ground as that first laid down in Chancery in the year 1715 (Packer v. Wyndham, Pre. Ch. 412), where a man who had married a woman of weak mind was compelled to settle her estate on herself. If this was the ground of the judgment in Harmon v. Van Ness, it is not without significance in this proceeding. But on that point I do not rely.

It appears that this trust arrangement, provided for in the judgment of the Supreme Court, was carried out or executed by Mr. Van Ness, his wife being a party defendant, and that the remaining estate not embraced in the trust received by this alleged testator under the will of Emma Louise Van Ness continued in his possession, but subject to certain contingent limitations over in the event that he did not exercise his powers of disposition. Such limitations of contingent remainders over after life interests, with power of disposition in life tenant, have become very common limitations in this state since the Revised Statutes. The $375,000 so set apart, it is conceded, did not pass under the will or codicil now before the surrogate in this proceeding to probate them. That a very large property did remain in the hands of Mr. Van Ness is apparent, and he continued throughout

his life to be entitled to receive a considerable income from the trust fund created pursuant to the said judgment. When received, it appears that he soon handed it, also, over to his third wife. It is quite unnecessary at this time to speak further concerning the judgment in Harmon v. Van Ness, except to observe that the attorney of record for Alice Wood Van Ness in that action, Mr. Parshall, was the same lawyer who later was the draftsman and attesting witness of the testamentary papers now propounded in this proceeding for probate. In Harmon v. Van Ness Mr. Van Ness was not represented by Mr. Parshall.

[17] Mr. Parshall was asked on cross-examination concerning his own knowledge at the time he drew the will of the claims of the heirs and next of kin of Emma Louise Van Ness as made in the suit of Harmon v. Van Ness. In other words, Mr. Parshall was asked, in effect, whether he knew that Alice Wood Van Ness was there charged with being an adventuress, intending to possess herself of the estate enjoyed by Mr. Van Ness under the will of his second wife. Objection was made that the record alone could show the state of his knowledge of such claims. But no attempt was made at that time by such questions to introduce in evidence the record qua record. The questions so put to Mr. Parshall were addressed merely to the knowledge of the witness and to his notice of the contestants' early position and allegations. The questions were also directed to the fact that after the witness had received such notice he became a party to all the subsequent proceedings stripping testator of his entire estate in favor of Alice Wood Van Ness and her family associates. It seemed to the surrogate that the knowledge of the witness as to the claims of those claiming adversely to Alice Wood Van Ness under the will of Emma Louise Van Ness was material in several aspects. It might not be very material in all respects, and yet in others it might be important. Mr. Parshall was distinctly charged by contestants with aiding and abetting Alice Wood Van Ness in all her subsequent acts regarding Mr. Van Ness' property.

The state of Mr. Parshall's mind was important, as was the extent of his knowledge of the precise situation of Mr. Van Ness and his estate. If the witness Parshall had acted professionally in good faith for Mr. Van Ness, without anything to put him on his guard, his subsequent action might be more justifiable. The propriety of his action, his credibility, bias, and the bona fides of his professional attitude in connection with the will offered for probate, were all involved in the pureness of his own intentions and actions on the occasions under investigation in this court. In such aspects his knowledge of the claims of the Harmons and the state of his own mind were material. London Joint Stock Bank v. Simmons, [1892] A. C. 201, 221. The contents of the record in Harmon v. Van Ness were not involved in such questions, and no proper rule of evidence was, I think, violated by the questions put, without exhibiting to the witness the record itself in the action of Harmon v. Van Ness. We are familiar with the rule that matter of record must be proved by the record. But the knowledge of the witness Parshall was not matter of record.

[18] But if any strict rule of evidence was, in fact, perchance,

violated by the surrogate, and I do not think that it wa§, it was quite immaterial in so far as the result of this proceeding is concerned. Whether Mr. Parshall knew,' or not, of the claims of the Harmons is not very material. Actual knowledge of a witness may, however, be inferred from a mere access to documents containing the facts chargeable. The judgment roll in Harmon v. Van Ness was in evidence, and Mr. Parshall was one of the attorneys of record. Where a witness admits that he knew the facts, nothing more is required by the way of proof of such knowledge. So a witness' good faith or bad faith in doing an act may be inferred from anything authorizing the inferences. Whenever a witness' intention in doing an act is material in law, it may be shown, if possible, and he may always speak directly to it. Mansell v. Clements, L. R. 9 C. P. 139. He may be asked what opinion he formed on seeing a document. The Queen v. King, [1897] 1 Q. B. 214. The constant objections in this court to questions to a witness, as to his own intention or knowledge while doing a particular act testified to as done by him, are in the main unjustified. If, for example, a witness testifies that he made a particular visit or drew a particular instrument in evidence in a proceeding of this kind, his intention is often very material under certain circumstances, and may be proved, if possible, except in cases for construction of written documents.

[**19, 20**] That the Harmon heirs had, after his third marriage to Alice Wood, some reason to apprehend that Mr. Van Ness might defeat their expectations under the will of Emma Louise Van Ness is apparent, as before such marriage he had already begun to make costly gifts to her and her family in Port Jervis, including real estate. It was conceded that Mrs. Alice Wood Van Ness and Mr. Parshall were in the vaults of the Nassau Bank engaged in an examination of the securities of Mr. Van Ness at the very moment process in the suit of Harmon v. Van Ness was served in April, 1900, some 60 days after the first ceremony of marriage between Mr. Van Ness and Miss Wood. While this fact is perhaps inconsequential in itself, it tends to disclose the circumstances of testator's property and testator's sudden and unusual relations with the persons charged with a later undue influence over it and him. That these comparative strangers to Mr. Van Ness should be concerned in any such examination so soon after the marriage is a strange circumstance in itself, perhaps possessing no legal significance and perhaps explained away. It is, however, a fact established.

In May of the year 1901, immediately after the injunction restraining Mr. Van Ness was removed in the action of Harmon v. Van Ness, Mr. Van Ness, the testator, is claimed to have transferred nearly all his securities and property to Alice Wood Van Ness. It is also in evidence that within two weeks after his marriage testator was importuned by Harry Wood, the brother of proponent, to make some such provision for proponent. This transfer in May, 1901, was without any actual consideration. The written act of transfer is in evidence. The transfer or gift, being a postnuptial one, was purely voluntary on the part of Mr. Van Ness; but its validity is not before the surrogate. It is, however, apparent that it contained no reservation in the favor

of grantor and no power of revocation reserved to him. I myself asked Mr. Parshall whether he advised Mr. Van Ness that the transfer should contain a power of revocation, and he said that he did not. In equity this would be considered a strange omission. This transfer in question denuded a very old man of all his property (except the annuity from the Havemeyer trust) by means of a postnuptial settlement in favor of a young woman who, although his wife, was almost a stranger. An antenuptial settlement would stand in a very different position in equity, as marriage is the highest consideration known. It did seem to the surrogate that the careless fashion in which the transfer of a large property was made was some evidence that old Mr. Van Ness lacked both vigor of mind and independent and proper legal advice about the times of the transfer and the will. These facts a court of equity might well consider. The only bearing they had on this contention was more restricted.

The crude and careless fashion in which the aged husband transferred all his very large property to one who, though his wife, was a comparative stranger to him, is some evidence of a condition of senility and incompetence charged at the times under investigation in this cause. Mr. Van Ness reserved nothing whatever for himself except the income of the trust fund already mentioned. This he could not convey to her, but he soon transferred the income to her. The settlement on his part on his third wife was so imprudent, so counter to human experience, as to excite the most minute inquiry into its bona fides. The slightest evidence would, I think, suffice to impeach it in a court of equity. But in this cause such transfers are entitled to be regarded only as a badge and circumstance tending to prove the undue influence charged. The transfer was superintended by Mr. Parshall, who was the very same lawyer who later drafted the will in controversy in this proceeding and superintended its execution, participating in the ceremony as one of the attesting witnesses. It is in evidence that Mr. Parshall was an old acquaintance of Miss Wood, and he and she had been friends from their respective youths in Port Jervis, where both lived for many years. Mr. Parshall had never known Mr. Van Ness until after Miss Wood met Mr. Van Ness. Mr. Parshall had not acted professionally in any way before 1900 for Mr. Van Ness, whose business and large estate had for a great many years prior to 1900 been managed by old and trusted legal advisers of Mrs. Emma Louise Van Ness in the city of New York.

That Mr. Van Ness had the abstract right at any time to change his agents and legal advisers cannot be gainsaid, and his excessive anger at the action of the Harmon heirs and their allies might well have been a good and sufficient justification, were it not for other circumstances disclosed by the evidence. Had Mr. Parshall shown himself free of all complicity in the denudation of Mr. Van Ness, and a competent and wholly disinterested legal adviser, keenly alive to professional obligations, the circumstances which I am considering and about to consider would have less bearing on the factum of will in this proceeding. As it is they have much.

About a year or less after Mr. Van Ness' marriage to Miss Wood,

Mr. and Mrs. Van Ness removed to Port Jervis from Cornwall, thus exchanging the beautiful and picturesque country, to which Mr. Van Ness had long been much attached, for one in which he was a total stranger. His life while at Port Jervis was passed in the intimate company of his new wife's family and their acquaintances and far from those of his prior lifetime. He was in the eighty-third year of his age and among strangers when the will in controversy purports to be made. It was made at Port Jervis, amidst the new surroundings of testator, and was drawn by Mr. Parshall and witnessed by those who were also comparative strangers to Mr. Van Ness and who had but recently come into his life through his last marriage. While little legal significance attaches to these circumstances standing apart, they are not devoid of relation to other serious circumstances about to be considered.

At the time Mr. Parshall drew the will now offered for probate it appears that he was in possession of $40,000 in prime railroad bonds belonging originally to Mr. Van Ness, or in his control under the will of his second wife for proper purposes. Mr. Parshall says the transfer of these bonds to Mr. Parshall was for legal services rendered by him. No bill was rendered; no services shown. If the evidence concerning Mr. Parshall's possession of this $40,000 of the bonds of testator had ended there, no grave irregularity would be apparent on its face. But it did not end there. Shortly afterward some disgorgement, it appears, was demanded of Mr. Parshall by Harry Wood, a young brother of Mrs. Alice Wood Van Ness, who had made the early postnuptial demand on Mr. Van Ness already mentioned. There is no evidence that Mr. Wood had any authority, or that Mr. Van Ness was privy to the demand on Mr. Parshall, or that Mr. Van Ness took any part in it, or ever received any benefit from the arrangement which followed the demand of Wood. This demand of Wood was a mere statement in effect:

"Give up some of your booty to me, or take the consequences."

Unexplained, such a transaction speaks louder than a human voice for Mr. Van Ness' total incapacity to manage his own affairs at the time the will was made. Mr. Van Ness had then given away without consideration about all his large property to Alice Wood Van Ness or her family, as before stated, except the $40,000 which Mr. Parshall himself had taken. Instead of giving it back to Mr. Van Ness, Mr. Parshall, it is conceded, agreed to give Harry Wood the income on the bonds then in Mr. Parshall's hands, to be paid during Mr. Van Ness' entire life. Here, without the consent of Mr. Van Ness, was an annuity in favor of a stranger carved out of property which Mr. Van Ness held as his own, subject to the will of his second wife. Mr. Parshall states that he made this extraordinary arrangement because Mr. Wood had introduced him to the profitable business which led to his receipt of these bonds. For many years Mr. Parshall states that this strange compact between Wood and himself was carried out. As long as Mr. Parshall was financially able, Mr. Parshall handed over all the income on the bonds to Mr. Wood; and when no longer

able, being sore pressed by Wood, Mr. Parshall even converted to his own use the fund of an estate of which he was then an executor in order to discharge the pressing demands of Wood. How pressing these obligations must have been is apparent by Mr. Parshall's resort to such desperate means of relief. As such obligations to Wood had no foundation in law, the arrangement is some evidence of the conspiracy charged in this cause, or at least it tends to support the contention of contestants that there was such a conspiracy to gain possession of the estate of the aged testator by any means possible, including the will now offered for probate.

If even this last-stated inference is too strong, or not justifiable, then we may safely conclude that the facts established in respect of the bonds in his custody do deprive Mr. Parshall of the advantage of that lofty position of professional independence and disinterestedness which is always highly essential in the draftsman of the will of one whose capacity, independence, and freedom are in doubt. The proponent should show, in this proceeding to probate a will in her favor, that the agent of the will was not her agent. Mr. Van Ness, the alleged testator, was in a very peculiar situation toward proponent at the time the will was drawn; he was among strangers, very old, and separated from his only daughter. His whole environment, his great age, and his many peculiarities certainly entitled Mr. Van Ness to the most independent, the most disinterested and competent, legal services on the part of the draftsman of his will. Mr. Parshall's relations with Wood and his sister, Mrs. Alice Wood Van Ness, disclose that he did not possess these qualifications, and that he was then under most serious responsibilities and obligations of some kind undisclosed to the family of this proponent. Mr. Parshall, in other words, did not occupy that position towards testator, at the time the will was drawn, which affords any guaranty, in itself, that the paper propounded was the free, unrestrained, and independent act of a capable testator.

Indeed Mr. Parshall's connection with the will does not benefit it under the circumstances. On the contrary, it raises grounds of suspicion that it was not the voluntary and free act of a capable testator. It was quite open to young Mr. Wood, who, as the record discloses, was present in court, to explain the transaction with Mr. Parshall about the bonds and its relations to Mr. Van Ness and his estate; but Mr. Wood was not called to the stand. Mr. Parshall's evidence on this point is wholly insufficient, and from it I am bound to infer that Mr. Van Ness, at the time of making his will, did not have that independent and disinterested legal advice which his dubious situation justly required. In other words, Mr. Parshall's evidence, standing alone, does not make it sufficiently or conclusively apparent to the surrogate that the will of June 24, 1901, was in fact the free and the independent act of a capable testator. On Mr. Parshall's evidence alone this will cannot be established, in view of the contestants' other proofs in this cause.

[21] The other attesting witness to the will now offered for probate was Mr. Senger, a brother-in-law of Mr. Parshall, and then a

young law student in Mr. Parshall's own law office in Port Jervis. The acquaintance of Mr. Senger with old Mr. Van Ness was most limited, and his permitted opinions on the testamentary capacity of Mr. Van Ness and that old person's freedom from all restraint on the occasion of the execution of the will are necessarily not on the highest foundation. Mr. Van Ness was a newcomer in Port Jervis, and the young law student hardly knew him. The greatest circumspection and care was necessary to establish the due execution of a will executed in Port Jervis, among strangers, by the aged Mr. Van Ness, almost exclusively in favor of his young wife, and contrary to prior testamentary intentions. Certainly attesting witnesses could have been selected whose witness would have been more conclusive upon factum of will than that of either of the young men actually selected.

When the character of persons acting as attesting witnesses is implicated by any circumstances connecting them with the sole beneficiary, their act of witnessing is necessarily somewhat affected, and their bias is then to be taken into the account by the surrogate. When their opinions on testator's capacity or freedom are weighed, they are entitled to less consideration than those of persons standing in a better and more exalted and neutral position. Testamentary law fully justifies these conclusions, if none other. The purpose of the law in requiring attesting witnesses to a will has been held to be "primarily for the security of the testator at the time of the execution of the will; the statute intending that the witnesses shall be in the nature of guards or securities to protect him in the execution of the will against force or fraud or undue influence." Wright v. Doe d. Tatham, 1 A. & E. 3. In the Will of Oscar Egerton Schmidt, 139 N. Y. Supp. 464, the surrogate recognized the accuracy of the statement in Wright v. Doe, just cited. In this cause now here the testimony of neither attesting witness is in a strong position to rebut the undue influence or fraud charged, if it is otherwise established.

It has been held in this country, though not, I think, in this jurisdiction, that undue influence is more readily inferred in case of a will in favor of a mistress than in case of a will in favor of a wife. Kessinger v. Kessinger, 37 Ind. 341. It has been also held that the undue influence of a husband over a wife is more easily inferred than that of a wife over a husband. Marsh v. Tyrrell, 2 Hagg. 84, 4 Ecc. Rep. p. 51. The integrity of both these decisions may, of course, be open to further contention, although the decisions just cited are only a recrudescence of a very old conception in law. In early Roman law, gifts between spouses were prohibited to some extent, in order to avoid the exercise of the influence now termed undue influence "ne mutuo amore invicem spoliarentur," or, in other words, "lest by mutual affection they should be despoiled in turns." So by the early law of France, only a husband or a wife who had no children could give property to the other, according to some old "coutumes," and then only in case they were equally alert and also equal in health, age, and belongings. Loysel, Institutes, 128. These early examples of legal restrictions on the undue influence of wives over husbands and husbands over wives are more interesting than important at present. They, however, recognize the very same danger which modern law

guards against in proper cases, as may be seen from the decision on Rollwagen's Will, in our own courts. 63 N. Y. 504. Human nature is much the same in different ages, and the law of testaments is a very old law and much the same in all countries for a thousand years past.

I will not forget that Alice Wood Van Ness was a wife in law, and I cannot overlook that as such she would be fairly entitled to some substantial provision out of her husband's estate. In this court she is entitled to all the legitimate inferences which, even in her particular case, attach to the most honorable and honored status of wife. But even an honored wife may be guilty of exerting undue influence over her husband in respect of his will. Each case of this kind is to be determined by its own circumstances, as is often said in the books of the law. The rules of courts of equity and courts of probate are, however, not the same in attaching the same specific presumptions of undue influence to confidential relations, such as guardian and ward, parent and child, and man and wife. In this court, in a testamentary cause, undue influence of the wife must always be established and never presumed from a mere relation of confidence. Parfitt v. Lawless, [1869] 2 P. & D. 462, 469. But, as I have stated at length before, an undue influence may always be established by circumstantial evidence only.

Old testamentary law recognized that any wife, good or bad, might be guilty of procuring a will by undue influence. Swinb. pt. 7, § 2. And ever since it is held in testamentary matters that an artful wife may readily subdue her husband to her own purposes so as to deprive him of a disposing mind which the law demands of a testator. Mountain v. Bennett, 1 Cox, 353, 355; Rollwagen v. Rollwagen, 63 N. Y. 504. While legitimate influence and persuasion are always permissible by a wife to a husband, if the wife ruthlessly disregard all propriety and all the rights of others dependent on testator in the process of attaining her own ends, that fact is a circumstance to be considered in determining whether her influence over her husband was in law legitimate or undue. In my inferences from the circumstantial evidence on this point I have endeavored to keep far within the range sanctioned by the decisions in such cases as Rollwagen v. Rollwagen. I have drawn no inference, and shall draw none, which by any chance or by the strictest rules of induction is not an irresistible inference.

[22] The situation of the parties, the condition of the testator's estate, and some of the circumstances, but not all, about the execution of the will of June 24, 1901, have now been regarded or considered. In order to establish any testamentary script as a will, animus testandi, or an intention to dispose of property by such instrument, or to designate the guardianship of a child, ought generally to be made apparent by a proponent. Now, Mr. Parshall testifies, with great distinctness, and he was the draftsman of the papers propounded as a will, that at the time the so-called will was drawn testator had so stripped himself of all his property by prior transfers to his young wife and her family that there was substantially nothing for the will to operate on. If the testator then understood that situation, and I fear he did not, for the

paper gave $25,000 to his daughter, Mrs. Parsons, then there was no real intention on his part to dispose of anything by the paper propounded. The consequence is that there is shown by proponent's own witness, the attesting witness to the will, that there was a total absence of animus testandi or intention to dispose by will on the part of the alleged testator. This is a very singular fact, and, being true, as Mr. Parshall asserts, the will propounded is a mere cover for a further assurance or a sort of dragnet release to his wife, which is entitled to very little consideration in a probate court. If the script propounded was not intended to be a will by the testator, in the sense of being a final disposition of property, it rises no higher than a mere declaration calculated to protect proponent, or else it is a sort of makeshift further assurance in her favor. If this is the true situation of the papers propounded, and from Mr. Parshall's own testimony I must conclude that it is, it is apparent that the papers propounded are not so much a will of Mr. Van Ness as they are proponent's own papers, for they are beyond all proper contemplation of the Statute of Wills.

While the dispositive character of a testamentary paper is not much looked at in this jurisdiction before probate (Matter of Meyer, 72 Misc. Rep. 566, 571, 131 N. Y. Supp. 27; cf. Van Giessen v. Bridgford, 83 N. Y. 355; Matter of Davis, 182 N. Y. 468, 75 N. E. 530), the surrogate is fully persuaded that a resort to the Statute of Wills with an intention on the part of a testator to do something else than dispose of his estate under color of a will is a defiance of the Statute of Wills, or, if not so, it is, in any event, a circumstance which ought not to be ignored by the surrogate in a case of this character, if the evidence is conflicting. That Mrs. Alice Wood Van Ness placed very little reliance on the wills now presented for probate is disclosed by her sworn petition for letters of administration on Mr. Van Ness' estate. She then knew that there was a will; but, accepting her own statement that it was mislaid or lost, she never attempted to establish it as a lost will in any way. It is to be noticed, also, that her petition for administration makes the estate insignificant in value. She already enjoyed the estate in possession.

But to go back to the factum of will. It was on June 24, 1901, when the testator had nothing left to give, that the will now propounded purports to be made giving Mrs. Parsons, the testator's daughter, $25,000, which testator then did not have to give, and about all the residue of nothing to this proponent, Alice Wood Van Ness. On January 24, 1902, another impotent paper, called a "codicil," was prepared by Mr. Parshall, which on its face took away from Mrs. Parsons even the $25,000 that she never could have received, if Mr. Parshall's evidence of Mr. Van Ness' pecuniary situation is to be taken as correct. This codicil, if a bona fide attempt under the Statute of Wills, and not a merely colorable instrument by way of consistent concealment of the prior complete denudation of Mr. Van Ness by Alice Wood Van Ness, her family, and Mr. Parshall, is in the same position as the will regarded as a dispository document. It disposes of nothing, and its proofs lack evidence of testamentary intention on the part of testator; that is, of "animus testandi" in

the complete sense of that established term of law. In England, whence New York derives much of its common law, a will would be refused probate because not dispositive. Lister v. Smith, 33 L. J. P. 29; Nichols v. Nichols, 2 Phill. 180; Matter of Meyer, 72 Misc. Rep. 571, 572, 131 N. Y. Supp. 27.

[23] But if we place no harsh construction on the codicil of January 24, 1902, and treat it also as an attempt to testamentate in good faith under the existing Statute of Wills, the evidence of its due execution by a competent and free testator is not very high. The codicil propounded was drawn by Mr. Parshall, and, like the will, the ceremony of its execution was performed at Port Jervis. It was witnessed by Mr. Parshall and by Dr. Lambert, a resident physician of Port Jervis. Necessarily Dr. Lambert's means of observing the testator were limited to their joint residence at Port Jervis, which was brief. This witness was the family physician of the Wood family. He could not remember whether or not Mrs. Van Ness was present when the codicil was executed. He came to the ceremony by Mr. Parshall's request. It was he, this witness, who sent Miss Wood away on the argonautic expedition which led to her marriage. The effect of testimony of attesting witnesses to a codicil like this has been discussed in Marsh v. Tyrrell, 4 Ecc. Rep. 46.

It is not necessary in a case of this kind to connect all the attesting witnesses with a conspiracy or the undue influence charged. Even persons of high character may be employed and fail to do their duty in a situation like that of Dr. Lambert and Mr. Van Ness. Mr. Van Ness was at Port Jervis, very old, among total strangers, and away from his only daughter and lifelong friends. He was then over 83 years of age. Yet there is no evidence that the physician took the slightest pains to examine Mr. Van Ness alone and apart from his wife or Mr. Parshall. He was not bound to unravel all the complicated conditions of his family relations or the tangled threads of Mr. Van Ness' past life. But he should have taken some pains to ascertain the facts he attested. This attesting witness was naturally most interested in the Wood family. He did not even know at the time of the codicil that Mr. Van Ness had an only daughter dependent upon him to some extent. It appears that this witness made himself only perfunctorily an attesting witness and a part of a testamentary ceremony conducted by Mr. Parshall in the presence of Mrs. Alice Wood Van Ness, the possessor of all of Mr. Van Ness' estate.

If we accept it all as true, the evidence of this attesting witness, Dr. Lambert, is not sufficient in itself to disprove the moral or physical subjection of Mr. Van Ness indirectly established by contestants at the time he executed this meaningless codicil. That the witness' part in the codicil was unobjectionable is all that can be said in favor of Dr. Lambert's testimony. This witness may have been duped by others, and his suspicions adroitly put at rest, so as not enable him to detect coercion and fraud, if any existed, as was said in Marsh v. Tyrrell. But without adopting any such harsh conjecture or inference as that fully justified by the decision in Marsh v. Tyrrell, the surrogate is of the opinion that Dr. Lambert's testimony is not sufficient in itself to disprove all the evidence against the codicil or in its disfavor. The

legal effect of all such evidence will be considered in my conclusion of this opinion.

[24] I come now to the consideration of an instrument in evidence in this cause which I regard as important and as most serious to the parties concerned in its preparation. Not content with this codicil, quite excluding the only daughter of testator from any possible participation in her father's estate, a formal paper was prepared, as the justification of the codicil. It was a minatory, heartless, and most unscrupulous writing to be prepared and witnessed by adults of the slightest respectability, if it was ever intended that it should be used against Mrs. Parsons; and subsequent events show that it was attempted to be so used as a means of subjecting the testator's only daughter, Mrs. Parsons, to a state of terror about the assertion of her claims to her father's property, whatever it was. Mrs. Parsons appeared in court, an elderly woman, and beyond all witnesses in my experience in her demeanor gentle and considerate. This lady had a large adult family, also of respectability and station. This extraordinary document, purporting to be made five days after the codicil, was in the handwriting of proponent and witnessed by Mr. Parshall, the draftsman of the will and codicil. I refer to the document reflecting on Mrs. Parsons' legitimacy and threatening her with exposure in the event that she ever attempted to commence a suit against Alice Wood Van Ness to break the wills.

This document purports to be signed by Mr. Van Ness himself, although it is wholly inconsistent with his fond letters in evidence to his daughter, and also with the single rather touching allusion in them to the very aged woman, once the wife of his youth. That single allusion denoted something in him long dormant. It ends all doubt on his once fond relations with Mrs. Parsons' mother. Of course, Mrs. Parsons being born in wedlock, her legitimacy was not open in law to such unscrupulous question as that attempted to be raised by this document. Any lawyer should have known that. In so far as the document itself purports to be executed by Mr. Van Ness, it is good evidence, to my mind, of his subjection to the very undue influence charged by contestants. No man in any other condition could have signed such a paper. There is not the slightest foundation for even suspicion that Mrs. Parsons was not the daughter of Mr. Van Ness and the legitimate wife of his youth. In any aspect, the paper now being considered is worthless, except in so far as it reflects on the person who wrote it and the lawyer who witnessed it. As to them it denotes a willingness to resort to means which were not in law or in morals legitimate to effect the testamentary dispositions they now cause to be propounded to me. Of this I must take notice. I will not have the honor of families needlessly aspersed in this court without some attempt to rebuke it. There must be some limit to cupidity here.

It is well established that a party defendant who bribes a juror admits to some extent guilt. I think that a party who resorts to such a paper as that now under my consideration, or who resorts to minatory and intimidating actions in a litigation, ought to be taken to admit to some extent the guilt charged. In this aspect this incriminating paper is most damaging to this proponent and to Mr. Parshall. It has been

said that a party is known by his witnesses. In re Benjamin's Will, 136 N. Y. Supp. 1073. This is a fortiori true of attesting witnesses to a will or a document. But I will say no more on this head. It was with great reluctance that I have said what is so obvious and at the same time so necessary to be said in the interest of justice.

[25] Many of the essential facts in this cause have now been touched on, but not all. After making the transfers and will and codicil in the manner already considered Mr. Van Ness lived on for 10 years apparently happily with his last wife. He died in the ninety-third year of his age. It is but just to proponent to say that there is evidence that throughout this period proponent conducted herself with propriety towards Mr. Van Ness. But he then still enjoyed an ample income of his own from the trust fund and this conduced to their joint comfort. There is proof that this income also he handed over to the last wife. That Mr. Van Ness was the better for his wife's kindly consideration and watchful care throughout this period is apparent. If it had not been for the gross evidence, already mentioned, a will of a man in favor of his wife would be entitled to great consideration in a probate court. It is said by some authorities that testamentary instruments procured by some kinds of coercion may be ratified when the coercion ceases, and Mr. Van Ness' subsequent declarations tend to show some sort of·acquiescence or ratification in the various provisions for Mrs. Alice Wood Van Ness. That very excellent old commentator on wills, Swinburne, states of a will coerced by fear that:

"If testator afterwards, when there is no cause of fear, do ratify and confirm the testament, I suppose the instrument to be good in law." Swinb. pt. 7, § 2.

A very excellent modern commentator on the American law of wills is evidently of the same opinion. 1 Redfield on Wills, 514, 515. Textbook writers, with three old exceptions, are not, however, in our law recognized as legitimate sources of law. Whenever cited, they are cited for illustration or consensus of interpretation, never by any chance as authority. But this same doctrine stated by Swinburne has been since often recognized in probate courts in cases where no change has been made for years by a knowing and competent testator alleged to have been coerced to making a will. It was regarded as a very cogent circumstance by the ecclesiastical courts when a coerced will was long abided by and not changed by testator after the coercion had ceased. But I think such acquiescence of late years is only regarded as evidence to rebut a presumption of complete coercion. In re Campbell's Will, 136 N. Y. Supp. 1100. I take it in any event that at the present day, when either undue influence or fraud is clearly established, such a constructive or presumptive ratification must be adequately made out in order to prevail in such a curious case as this. If there is any inherent circumstance which rebuts such presumption or inference, it is not applied.

It must be remembered that Mr. Van Ness was in about the eighty-fourth year of his age when he made the codicil, only six months after he had made the will now also in question. He had then stripped himself, or been stripped, by conveyances or assignments, of every bit of

tangible property he had in the world, even including his own favorite horses. What a lamentable situation for a man of property! There is no proof that at any time afterwards he ever did a single act of a serious business nature. There is some proof that he did not. He was, after the making of the will, as completely dead to all affairs of a business nature as a man could be and be alive. While there is some evidence of continued intelligence on his part in minor human interests, even this is not very marked. He lived on, a mere simulacrum of a once powerful man. He had abdicated his property and all business functions to his young wife. In what way should such a very old man so situated be held to a constructive ratification in such a case as this, or to a ratification by mere acquiescence? It is interesting to observe that in some countries, in no distant age, an abdication of all of his property by a man was regarded as the equivalent of his civil death. No further property rights inhered thereafter in such a man. He could do no civil act. He could neither act, nor ratify an act. He was civilly dead. While we are in no danger of mistaking such curiosities of by-gone laws for actual modern law, there is a pregnant suggestion to be deduced here from the old law cited.

Certainly, in this cause before me, if the acquiescence of Mr. Van Ness is held forth by proponent as a plea in condonation of an offense or offenses established, the acquiescence alleged should be made out, not presumptively, but actually, in order to prevail under the circumstances of this particular case. The fact that he was miserably old, entirely disassociated from all business affairs, and away from close association with the only being who in the ordinary course of nature could have had for him a profound or deep-seated affection (I refer to his only daughter), is to be taken into the account, and it requires proof of a free, intelligent, and complete ratification by Mr. Van Ness. His acquiescence should be made out by proofs as clear as the noonday, if it is to prevail in this cause. The garrulous maunderings of a senile man in the presence of any stranger that he and his wife picked up in the course of foreign travel are not sufficient. Nor should they be construed into a ratification, or treated as a declaration of consequence, unless safeguarded by other relevant facts denoting freedom from all wifely pressure and influence.

Whether, indeed, a will procured by fraud or undue influence may ever be ratified in law is a very subtle and serious question, not distinctly answered by any modern case. In modern cases such ratifications by acquiescence are treated rather as presumptions rebutting circumstantial evidence of fraud and duress. A greater and even more distinguished Doctor of the Civil Law than Swinburne, one more familiar, if possible, with the fundamental principles of civil and canon law regulating wills and the practice in the ecclesiastical courts of England, once having jurisdiction of probate law (and in probate law this law and practice is yet of some authority here, even at this late time)—I refer to Ayliffe—in his well known Parergon Juris Canonici was of the opinion that a defect in a will affecting testator's freedom could never be taken away by ratification or by any subsequent act in law. Ayliffe distinguished between a will defective in some act of

solemnity and one procured by fraud or fear, maintaining, in substance that the latter defect was incapable of ratification. While Redfield is evidently of the opinion of Swinburne, I find no express authority on the point. But be this as it may, and the rule need not be considered further at this time, for the surrogate can find no adequate proof of ratification or acquiescence by Mr. Van Ness sufficiently apparent in this cause to condone the established res gestæ about the will and codicil.

[26] When acts of undue influence are proved no doubt the declarations of testator are competent to show the effect such acts had on his mind, and even to dispel and rebut any claim of imposition. Cudney v. Cudney, 68 N. Y. 152; Matter of Nelson, 141 N. Y. 157, 36 N. E. 3; Matter of Corcoran, 145 App. Div. 129, 132, 129 N. Y. Supp. 165. That there is evidence of such declarations by Mr. Van Ness is apparent to me and I have given them great consideration. But what are such declarations really worth in this instance, when the testator had become so old, so confessedly incompetent to manage his own business affairs, and when the tangled web of his new marriage relations, with its intricate meshes, involved every act of his entire life? It seems to the surrogate that in this particular case they are of little force or value. Such declarations, to carry weight, should also be proved to be the free and voluntary acts of a capable man. Such declarations, to be of value to a testamentary act, must have been made under other circumstances than those shown to exist in this cause. Otherwise their weight is trifling and insufficient to overbear facts clearly established by competent proofs.

[27] Before a will is admitted to probate the surrogate must be satisfied of the genuineness of the will and the validity of its execution. Section 2622, Code of Civil Procedure. That section means satisfied in accordance with probate law. Now, the burden is on proponent, in every probate cause and in every instance, to satisfy the conscience of the court that the instruments propounded constitute the last will of a free and capable testator. Howland v. Taylor, 53 N. Y. 628; In re Campbell's Will, 136 N. Y. Supp. 1102; In re Van den Heuvel's Will, 136 N. Y. Supp. 1125, and cases there cited. If a single ground for suspicion exist in a probate cause, the proof must be clear in order to establish a will. In re Van den Heuvel's Will, and cases there cited, 136 N. Y. Supp. 1125. In many cases where wills, charged to be the product of fraud, cupidity, and undue influence, have failed of probate, it has been because the burdens resting on a proponent, to satisfy the conscience of the court that the will propounded was the will of a free and capable testator, have not been adequately discharged. Mortimer on Probate, p. 80. On this ground alone the surrogate may decline probate, and in probate law the ground is good and sufficient.

Other reasons than those mentioned might be deduced from the proofs in this cause, and assigned by the surrogate in support of the conclusion reached. But the foregoing will suffice. It may be added that the proponent is not much affected by this decision. The property passing under the scripts propounded, if any, is so insignificant

as to be of no consequence to proponent. If the postnuptial settlements in her favor given in evidence, stand, and even postnuptial settlements inter partes are entitled to great consideration from courts of justice, the proponent has no need of the wills in her favor, and no one else, except the guardian, seriously contends for them. While such considerations as the effect of a decision are perhaps out of place in a court of probate, it is impossible for the surrogate to ignore the state of Mr. Van Ness' estate on an issue of the kind presented in this cause. The surrogate cannot help seeing that little or nothing purports to pass under the papers propounded. This entire proceeding for probate has been a vain and empty thing. It is not what it seems, but only the prelude to a more serious struggle, with which the surrogate has no concern. The parties are here contending only for an advantage elsewhere. The decree sought by proponent is to be used as a shield in other litigations, and not according to its tenor and real purport. For this reason the surrogate feels less regret at being obliged to withhold the seal and imprimatur of this court to the wills propounded.

The proponent has in no event adequately discharged the burdens resting on her in this cause. The surrogate is not satisfied that the testamentary scripts propounded in this cause were the free, the deliberate, and the conscious acts of a capable testator, and for this reason, and this reason alone, the probate sought is refused.

Settle decree accordingly. The special guardian only will be entitled to an allowance.