(89 Misc. Rep. 1)

## In re WILLIAMS' WILL.

### (Surrogate's Court, Seneca County.   January 8, 1915.)

1. WILLS (§ 163*)—UNDUE INFLUENCE—BURDEN OF PROOF.
   The burden of proving that a will was procured by undue influence is on the party who asserts it.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402; Dec. Dig. § 163.*]

2. WILLS (§ 155*)—"UNDUE INFLUENCE."
   "Undue influence" consists in exerting upon the testator such an improper influence as results in the person's being impelled or compelled to make a testamentary disposition which he otherwise would not have made.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*
   For other definitions, see Words and Phrases, First and Second Series, Undue Influence.]

3. WILLS (§ 158*)—UNDUE INFLUENCE—EVIDENCE.
   For a will to be denied probate on the ground of undue influence, it must be shown, not only that there was opportunity and motive to exercise such influence, but that it was exercised in fact in sufficient degree to overcome testator's will.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 385, 386; Dec. Dig. § 158.*]

4. WILLS (§ 166*)—UNDUE INFLUENCE—SUFFICIENCY OF EVIDENCE.
   Evidence *held* to show that a will was made under undue influence.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

Proceedings on the probate of the will of Rebecca Williams, deceased.   Probate denied.

MacDonald Bros., of Seneca Falls (Hermon A. Carmer, of Seneca Falls, of counsel), for proponents.

Daniel W. Moran, of Seneca Falls, for contestants.

BODINE, S.   Rebecca Williams, the testatrix, died on the 14th day of May, 1914, aged somewhere between 82 and 85 years.   Her will was executed on the 20th day of March, 1912, and in it she named the proponents, two of her daughters, Mrs. Eleanor Wayne and Miss Alicia Williams, as executors.   She was survived by six daughters, and left an estate of approximately $26,000.   By the terms of her, will she gives each of her daughters, naming them, $1,000, and the rest of her property goes to the two executors.   At the time of the execution of the will her property consisted of several houses and lots and some $4,500 in money in various banks.   The will was prepared by an attorney, who received his instructions from the executor Alicia Williams;  she having brought memoranda from time to time to the attorney's office from which the will was prepared.   The attorney, while personally acquainted with the decedent, had not seen her for ten years prior to the execution of the will, and at the date the will was executed there was no one present except the two executors, the attorney, and a clerk from his office;  the two latter acting as witnesses

to the will. The will was properly executed, all the necessary formalities being strictly complied with; the only questions left to determine being as to the testamentary capacity of the testatrix at the time the will was executed, and whether the making of the will was induced by fraud and undue influence exerted on testatrix by the two executors.

It appears from the testimony that the testatrix and her daughter Alicia lived together alone for a number of years, and that for the last four or five years of decedent's life she had gradually failed in health and some time in the month of December, 1911, about three months prior to the execution of this will, her health had become such that the daughter, Mrs. Wayne, came to the house and assisted in taking care of the mother; the family at that time consisting of the decedent and the two daughters. Another daughter lived in Seneca Falls, and was at the house practically every day up and until the 12th day of February, 1912, when she and her husband went on a trip and were gone about six weeks. The other daughters live in the West.

On the night of the 10th day of February, 1912, Mrs. Wayne called her sister, Mrs. Elwell, on the phone and asked her to take their sister Alicia with her to Florida. This suggestion was without the knowledge of Miss Alicia, and the time was so short that arrangements could not be made to take her, and she remained at home. About this time, but whether before or after the evidence does not disclose, Mrs. Wayne brought up the question of the mother making a will, and it is contended by the contestants that it was a scheme on the part of Mrs. Wayne to get Miss Williams away from Seneca Falls, so that she could have free access to the mother and have the will made entirely as she wished it. Whether this supposition is true or not makes but little difference here, for the evidence discloses that the will was dictated by Mrs. Wayne to Alicia, who wrote it down in the presence of the mother; that it took some four weeks to get the will whipped into shape, and the matter had to be hurried to get it done before the Elwells returned. It appears that during the talk about the making of the will and the dictating of its terms disputes at various times arose between the two executors as to what each was to have, and these arguments at times became very heated, always taking place in the presence of the mother, who sat quietly by and took no part in the conversation. After the memoranda had been prepared to the satisfaction of the executors, Miss Alicia took it to the attorney's office, and he prepared the will therefrom without any conversation with or personal direction from the testatrix, and when he had transcribed it went to the house at the suggestion of the executors and the will was executed.

The evidence presents a most peculiar situation. The petition for the probate of the will is signed by both of the executors. Miss Alicia Williams, one of the proponents, having been called by the contestants, testified in favor of the will, and denied many statements regarding its preparation that the contestants claimed were made by her and by Mrs. Wayne in their presence after the will was read and before it was offered for probate. These statements, the substance

of which I shall set forth later, are very material in the consideration of the question of undue influence, and the fact that Miss Williams afterwards changed her testimony to conform to that of the two contestants, and that these statements and charges were never denied by the other proponent, who was in court at each hearing, are, to say the least, very suggestive.

On these statements and admissions the contestants rely to prove that undue influence and fraud were used in bringing about the making of this will. These admissions in the main are to the effect that Miss Alicia knew the will was not right, and was not her mother's will, but that Mrs. Wayne made such a disturbance in the house, and made it so disagreeable for the mother, that rather than have the trouble and annoyance she consented that the will be executed knowing that the other sisters would not stand for it when it was offered for probate, and that probate would be denied. At one of the conversations when the four were present, Mrs. Wayne turned on Miss Williams and made the remark: "Now, I will tell something I wasn't going to tell. You put down all the furniture to yourself. Mother didn't know it, because you mumbled it." Alicia replied to Mrs. Wayne: "You forced mother to make that will." And during the same conversation Mrs. Elwell remarked: "Why was this will made when I was away, and why was I not told of it?" To which Mrs. Wayne replied: "None of your business."

The contestants also have proven that within 10 days after the making of the will the two proponents caused Mrs. Williams to transfer all her money in the savings banks, amounting to something over $4,000, one-half to each one, so that they immediately came into possession of practically all of the personal property of their mother. It is true that the deposits in each bank were made in the name of the mother and one of the proponents, but in such a way that the proponents had actual control of all this money, and there was no property left, other than the real estate, out of which the legacies provided for in this will could be paid.

It also appears that the family physician, Dr. Follett, who was allowed to testify, and who had treated Mrs. Williams off and on for some 10 years prior to her death, diagnosed the malady under which decedent was suffering some time during the late summer or fall of 1911 as senile dementia, which gradually progressed and finally was one of the contributing causes which caused the death of the testatrix. In his opinion the disease had so far progressed that on March 20, 1912, the day the will was executed, testatrix did not know what she was doing. It is not denied by any one that at about the time this will was made the testatrix was in feeble health. She had broken arches and dropsy, and was unable to move about the house, except with assistance. She had apathy, hebetude, dullness of mind, lack of facial expression, inattention, and at times had asked to be taken home, had called for her husband, and exhibited other characteristics of senility.

There were no lay witnesses called to describe any of the acts or relate any of the sayings of the testatrix at about the time the will was executed or for a number of years prior thereto, and the court is com-

pelled to rely upon the evidence of the two subscribing witnesses, neither of whom had seen her in a number of years, and the expert physicians called by them for the upholding of the will, and on the evidence of the family physician, two of the contestants, one of the proponents, and medical experts against the validity of the will. This situation was brought about by the fact that the testatrix had not been out of her yard in about 10 years, and spent nearly all her time in the house, behind closed doors and either did not care to see any one, or for some reason was not allowed to see any one, during all these years, so there was no one who could testify as to their observation.

The testimony of the expert witnesses is very unsatisfactory, for the reason that the hypothetical question as propounded by the contestants started off with the phrase, "Assuming that the testatrix had senile dementia in December, 1911," while the hypothetical question as propounded by the proponents left out the fact that she had senile dementia, and all of the experts called by the proponents admitted that the symptoms embodied in the hypothetical question, as asked by the contestants, were usually found in persons that had senile dementia, yet it did not necessarily follow that, because the patient had those symptoms, she had senile dementia and was incompetent to make a will.

There can be no question, and it practically is conceded by all the experts, that an old lady, suffering with a weak heart, hardening of the arteries, bloating of the lower extremities, and who showed a lack of interest, inattention, apathy, dullness of mind, and a lack of facial expression, and loss of her natural emotions, as testatrix did, would be easily susceptible to undue influence, and, rather than to raise any objection or make any disturbance, might permit and allow herself to do things called to her attention by designing persons in order to gain peace and quiet, and with but little attempt on her part to assert herself.

On behalf of the proponents, Mr. William S. MacDonald, who prepared the will and superintended its execution, testifies that he had not seen the testatrix in about ten years; that his attention was attracted to how well she looked, and he spoke to her in regard to it, and that she comprehended what he said to her; that he had the daughters leave the room, read the will over to the testatrix, and at the end of every paragraph he raised his eyes to her, and she either nodded her head, or stated, "Yes, that is right," or words to that effect; and that she apparently, and he believed that she did, fully comprehend and realize what was in the paper that she was signing, and that she signed it voluntarily, of her own will, and was not under any restraint of any kind. The other subscribing witness, who is a clerk in the attorney's office, also testifies that she saw nothing out of the ordinary, and that in her opinion the testatrix was of sound mind and not under any restraint. It must be borne in mind that these two witnesses had not seen the testatrix before in a number of years, and at most they were only in the house for a few minutes, and that the two daughters who are charged with having unduly influenced the testatrix knew that the attorney was coming to read the will, and they had time to arrange all the preliminaries, and, as one of them testifies, had posted the mother as to what she was to do and to say when the lawyer came.

In deciding this case, I want it to be plainly understood that I have the greatest confidence in the scrivener of this will, and believe that everything that happened and occurred on the day the will was executed and during its preparation happened exactly as he has testified, and that he acted in the utmost good faith in all that he did.

But little, if anything, is disclosed by the evidence as to the past life of the testatrix. Whether or not she was a woman of strong will, who did her own business and looked after her property generally, is unknown. Her husband had been dead for some 15 or 16 years, and in the latter part of 1911, when Mrs. Wayne came to the house, Alicia was looking after the real estate, collecting the rents, paying the taxes, etc., and it is not shown that Mrs. Williams herself ever did any business of any nature, except to sign a few checks. It is very unfortunate that some of these matters were not shown, for then the surrogate would have had some basis by which he could compare her condition at the time the will was executed with what it was when there was no question but that she was in full possession of her faculties and competent to take care of herself and manage her business. It also appears that there was a prior will, which was destroyed on the advice of the attorney; but whether it was along the same lines as the present will or not there is no information.

It would appear from the evidence that Mrs. Williams never spoke a word to any one or made a suggestion relative to the making of this will, or in any way assisted in its preparation, but that all the memoranda were made, all the suggesting was done, and the various dispositions of the property arrived at by the two executors, without consulting the mother in any way, and that from these memoranda, prepared under these circumstances, the attorney drafted the will without talking to the decedent, and with no personal direction of any kind from her, and all that she ever did in reference to the will before it was executed was to have it read over to her, and she made various replies, stating that the will was correct. This is quite a long intricate instrument, and the testatrix suggested no change in it, and apparently did not talk to her attorney in regard to the property, as to its amount and where it was located, and because of these facts the testimony of the subscribing witnesses loses much of its force and power, for, if the testatrix herself had gone on, of her own volition, and selected the attorney to draw the will, had herself made the memoranda or personally directed the attorney as to what she wished done, it would show her to be in possession of mental power at least sufficient to understand what her property consisted of and who the persons were that would be the natural beneficiaries of her bounty. It requires but little intelligence and but little mind for a person to assent to clauses and statements read over to her, where she does not have to grasp the whole situation and direct what is to be done, and especially is this true if she is at the time subservient to the will of another, who has coached her as to what to say.

There is, perhaps, nothing unnatural about the will itself, although it only gives $4,000 among four daughters, and the balance of $22,000 to two other daughters, for it appears that the two last daughters are not in as good financial circumstances as the other four, and that Miss Alicia, at least, had always lived with and taken care of her mother, and

Mrs. Wayne lived at home until the time of her marriage, some eight or ten years before the execution of the will, and that she returned when the mother's health became bad to assist in caring for her during her declining years. These acts on the part of Mrs. Wayne and Miss Williams were highly commendable, and it would be no more than right and just that they should receive a larger part of the estate than the other sisters, and there was nothing to prevent the mother, if she so desired, from giving these two daughters her entire property, for it was hers to dispose of as she saw fit, and it is not for this court to say that, had she done so, under these circumstances, such a disposition would have been an unjust one.

It is apparent that the physician who attended this old lady, and saw her at least every week and sometimes oftener, and who visited her with the purpose of prescribing for ailments under which she labored, and who, for weeks prior to the execution of the will, had prescribed breta carb, which was given as a brain medicine, was entitled to much more weight in determining the mental capacity of the decedent than that of the attorney, no matter how careful he may have been, who saw her on only one occasion for not over 30 minutes, and then only read to her certain papers which he had prepared and which she had no hand in dictating. In re Schmidt's Will (Sur.) 139 N. Y. Supp. 472.

In the disposition of the case which I am about to make, it is unnecessary for me to determine whether on the 20th day of March, 1912, the decedent had sufficient mental capacity to make a will, for it is admitted that at that time she was in a weakened condition, caused by a gradual breaking down of her health, her mind had lost much of its vigor, and she was easily susceptible to the influence of people about her. This brings us to the question of fraud and undue influence.

[1] Courts proceed with great caution in setting aside the probate of wills on the ground of undue influence. The burden of proving undue influence is upon the party who asserts it, and, while it is seldom susceptible of direct proof, nevertheless in each case there must be affirmative evidence of the facts from which such influence can fairly and reasonably be inferred. Cudney v. Cudney, 68 N. Y. 150; Tyler v. Gardiner, 35 N. Y. 559; Delafield v. Parish, 25 N. Y. 93.

[2] Undue influence consists in the exerting upon the testator of such an improper influence as results in the person's being impelled or compelled to make a testamentary disposition which he otherwise would not have made. Matter of Martin, 98 N. Y. 193; Matter of Mabie, 5 Misc. Rep. 179, 24 N. Y. Supp. 855.

This undue influence may be brought about by a strong person constantly importuning one of weaker mind to do an act, until the weaker mind gives way and no longer resists, and when a will is executed under such a state of facts it should be denied probate.

Undue influence, from the nature of things, is very seldom susceptible of direct proof, for the person who is exerting the influence would, as a general proposition, do it in secret and in a clandestine way; but when such a set of circumstances are proved as to make the inference irresistible that the will was prepared as a result of such influence, then probate must be denied.

[3] It must be shown not only that there was opportunity to exercise undue influence and motive to exert it, but it must further appear that such influence was actually exerted and that it was sufficient to break the will of the testator. Matter of Van Ness Will, 78 Misc. Rep. 592, 139 N. Y. Supp. 485; In re Crockett's Will, 86 Misc. Rep. 631, 149 N. Y. Supp. 477; Children's Aid Society v. Loveridge, 70 N. Y. 394.

The case of Tyler v. Gardiner, 35 N. Y. 559, is one of the leading cases on the question of undue influence. In that opinion the court has this to say, at page 592:

"When the principal beneficiary under a will, prepared for execution by a party worn down by disease and close upon the verge of death, assumes the responsibility of initiating it, of preparing formal instructions, of employing the draftsman, of selecting the witnesses, of being present at every stage of the proceedings, and of excluding those to whose inheritance a new direction is given, it behooves such beneficiary to be provided with evidence that the instrument expresses the honest and spontaneous purposes of the person who is called upon, at such a time, to reverse the provisions of a previous testamentary disposition, made in health and strength, in favor of those having clear claims upon the favor and bounty of the testator"—citing Delafield v. Parish, and numerous other cases.

And later in the opinion it is said:

"When the beneficiary is the active agent in procuring the execution, by one in extremis, of an instrument disturbing dispositions previously settled, and where the transaction is surrounded by the usual indicia of undue influence, he is called upon to show that the inducements which confessedly led to the change were not unfounded and illusory. * * * It is true that the burden of establishing imposition and undue influence rests in the first instance upon the party by whom it is alleged. Fraud is never to be presumed from the mere occurrence of temptation and opportunity, or from the mere fact that the chief actor is also the principal beneficiary. It must be established by affirmative evidence. It is thus established, however, when facts are proved from which it results as an unavoidable inference. When such evidence is furnished, the burden of repelling the presumption, to which it leads, is cast upon the party to whom the fraud is imputed. It is not to be supposed that fraud and undue influence are ordinarily susceptible of direct proof. Subscribing witnesses are called to attest the execution of wills, but not the antecedent agencies by which they are procured. The purposes to be served are such as court privacy rather than publicity."

And later in the case this language is used:

"In the present case, all the controlling facts tend to one unavoidable conclusion. When the antecedent and surrounding circumstances are grouped in their appropriate relations, they carry to the conscience and the understanding the clear conviction that, when the mother affixed her signature, she was executing the daughter's will. It is no sufficient answer to the presumption of undue influence, which results from the undisputed facts, that the testatrix was aware of the contents of the instrument, and assented to all its provisions. This was the precise purpose, which the undue influence was employed to accomplish."

And it is further said:

"The question is, not whether she knew what she was doing, had done, or proposed to do, but how the intention was produced."

[4] In my opinion, the contestants have conclusively shown that the will in question is not the will of the testatrix, but is a will prepared and made by the two proponents, Mrs. Eleanor Wayne and Miss Alicia

Williams, the execution of which was obtained as a result of undue influence exerted by them upon their mother. Had there been a denial of some of the circumstances proven, the court possibly could have taken a different view.

The evidence convinces me that at the time, or shortly thereafter, that Mrs. Wayne came to her mother's house, she used every effort in her power to get her mother to make a will, and the object of that will was to obtain all the benefit that she possibly could out of the estate. As the evidence stands, the fact that she tried to get Alicia to go to Florida cannot but be suggestive. The inference was apparent on the trial, and if Mrs. Wayne had any other motive in view she should have explained it. Some of the other suggestive facts are that the lawyer was not permitted to see the decedent until the details of this intricate will had been prepared, all of which were dictated by one of the proponents and were in the handwriting of the other, who testifies that her mother said nothing about its provisions; that after the death of the testatrix, and when confronted by the other two sisters, and charged directly by the proponent Miss Williams that she (Mrs. Wayne) had made her mother make the will, she had not denied it; that she (Mrs. Wayne) then and there accused the other proponent of inserting matters in the will, and which even she (Miss Alicia) does not deny, and which were unknown to the mother; the statement that Mrs. Wayne made to her sisters, after the will was made, that "in time she would get her innings," and when asked by the sister in Seneca Falls why she was not notified of the making of the will replied, "None of your business." The hurrying to get the will executed before Mrs. Elwell returned from Florida was with the object of having it done secretly and unknown to the other sister, and the fact that so soon after the will was executed these two proponents both immediately took steps to acquire and gain possession in their own right of all the personal property belonging to their mother, when, under the terms of the will, they were to get it eventually, looks as though they meant to be doubly sure that nothing should escape them. There was no excuse for this transfer, or at least none was attempted to be shown. The only possible reason which suggests itself to the surrogate is that the mother's health had become such that it was difficult for her to write her name, as the signature to the will shows, and it was troublesome to annoy her with matters which the sisters were in the habit of doing anyway. If that was the only motive, and it was honestly entertained, why was it not all transferred to Miss Williams as agent, who, up to this time, had had charge of the collecting of the rents and the expending of the moneys? And when we consider this transfer of the personal property in connection with the clause in the will providing that anything that the proponents received in their lifetime should not be charged against them, it is, to say the least, a display of business sagacity from which only one inference can be drawn, and that is that it was prompted by no other motive than to obtain all possible moneys and advantages that they could from their mother.

As was said in Tyler v. Gardiner, above referred to:

"When we find the party, whose right and interest it was to countervail the force of the facts by evidence, content to leave them unrebutted and un-

explained, and to abide by the conclusions to which they so clearly tend, we have nothing to do but to draw the unavoidable inference, and, applying the settled rules of law, to sustain the rejection of the will. It may be that the whole truth of the case is not before us; that facts exist which, if proved, would relieve it from some of the unfavorable aspects; but we are bound to take the evidence as we find it, and to give it effect in accordance with our clear convictions."

I therefore deny probate of the will, and an order may be entered accordingly.